UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

GPS Industries, Inc.,                          Case No.: 8:09-bk-16766-CPM
                                                Chapter: 11


_____ Debtor. _____/


DISCLOSURE STATEMENT FOR
PLAN OF REORGANIZATION FOR
GPS INDUSTRIES, INC.


Richard J. McIntyre, Esquire
McIntyre, Panzarella, Thanasides,
    Eleff & Hoffman, P.L.
6943 E. Fowler Avenue
Tampa, Florida 33617

August 5, 2009

# I. INTRODUCTION

**This is the Disclosure Statement** (the "Disclosure Statement") for the Chapter 11 case of **GPS Industries, Inc.** (the "Debtor" or the "Company"). The Debtor filed its voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on July 31, 2009 (the "Petition Date"). This Disclosure Statement contains information about the Debtor and describes the **Chapter 11 Plan of Reorganization** (the "Plan") filed by GPS Industries on August 5, 2009. A full copy of the Plan is attached to this Disclosure Statement as **Exhibit "A."**

*Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

The proposed distributions to General Unsecured Creditors under the Plan is discussed at page 12 of this Disclosure Statement. **General unsecured creditors are classified in Class 3A and 3B.** Class 3A will receive a pro-rata distribution from a $200,000 fund (as soon as is practical under the circumstances), or may elect, to convert their claim to a Class 3B Claim. **These claims shall be paid (a) the lesser of the actual amount of the claim or (b) $500, in full satisfaction of the claim. This payment shall be made within 120 days from the Effective Date of the Plan.**

## A. Purpose of This Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,
- How the Plan proposes to treat claims or equity interests of the type you hold (*i.e.*, what you will receive on your claim or equity interest if the Plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,
- Why GPS Industries, Inc. believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and
- The effect of confirmation of the Plan.

**Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.**

## B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement. This Section describes the procedures pursuant to which the Plan will or will not be confirmed.

1. The **Hearing** at which the Court will determine whether to approve this Disclosure Statement and confirm the Plan will take place on _____2009, at _:__ m, in Courtroom 8B, at the **Sam M. Gibbons Courthouse, 801 N. Florida Avenue, Tampa, Florida.**

2.      **Ballots: If you are entitled to vote** to accept or reject the plan, **vote on the enclosed ballot and return** the ballot in the enclosed envelope to the U.S. Bankruptcy Court, 801 N. Florida Ave., Tampa FL 33602 and send a copy to McIntyre, Panzarella, Thanasides, Eleff & Hoffman, P.L., 6943 East Fowler Ave, Tampa, Florida 33617. See Section IV A. below for a discussion of voting eligibility requirements. **Your ballot must be received by _____, 2009, or it may not be counted.**

3.      Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon the Debtors and all parties in interest by ____, 2009.

4.      If you want additional information about the Plan, you should contact Richard McIntyre, McIntyre, Panzarella, Thanasides, Eleff & Hoffman, P.L., 6943 East Fowler Ave, Tampa, Florida 33617, via email at: rich@mcintyrefirm.com.

**C.      Disclaimer**

*The Court has conditionally approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has conditionally approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted. The Court's approval of this Disclosure Statement is subject to final approval at the hearing on confirmation of the Plan. Objections to the adequacy of this Disclosure Statement may be filed until _____, 2009.*

**II.     BACKGROUND**

**A.      Description and History of the Debtor's Business**

Debtor, **GPS Industries, Inc.,** is a Nevada corporation **(OTCBB:GPSN)**. The Debtor develops and markets GPS and Wi-Fi multimedia solutions, to enable managers of golf facilities, resorts and residential communities to improve operational efficiencies and generate new revenue bases.   The Company's patented **Informerer™** Management Solutions system offers integrated software applications and high-resolution 10.4-inch "HD/MAX" (cart mounted and hand held) display panels. The HD/MAX vividly illustrates each hole, providing precise measurement displays with data and strategic stroke suggestions; the customized advertising message application is a source of revenue if utilized. The Debtor's primary business is the development, manufacture and sale of the Inforemer™ HDX mobile display units (MDU) in both cart mounted and hand held product lines along with the related infrastructure and software applications.

GPS Industries, Inc. was originally incorporated in Nevada, in1995 as Diversified Marketing Services Ltd., changed its name in 1999 to Inforetech Wireless Technology Inc, then to GPS Industries, Inc. in 2004. GPSI common stock was first publicly traded on the OTC Bulletin Board in

January 2000 as Inforetech Wireless Technology and is currently trading on the OTC Bulletin Board under the symbol "GPSN."

In January 2001, Inforetech Wireless Technology Inc. acquired 100% of the outstanding stock of ProShot Golf, Inc. through a wholly owned subsidiary, Inforetech Golf Technology 2000 Inc. (IGT). On December 19, 2002, IGT filed a voluntary petition for relief under Chapter 7 of the U.S. Bankruptcy Code; on May 31, 2002 ProShot filed a voluntary petition for relief under Chapter 7 of the U.S Bankruptcy Code.

In October 2007, GPSI acquired 100% of the outstanding stock of Direct Golf Services Inc. and Golf Academies Ltd., together now as GPSI Europe. GPSI also owns 17.5% of GPSI Asia, its Asian distributor.

On January 18, 2008, GPSI's wholly owned subsidiary, GPS IT, LLC, acquired the assets and assumed certain liabilities of Uplink. In mid 2009, the Debtor merged GPS IT, LLC and Optimal Golf Solutions, Inc., into GPSI.

GPSI. is a global technology solutions provider with customizable, patent-protected applications in GPS and Wi-Fi software and hardware for use with golf course operations, residential developments and other recreational and industrial applications. With the development of the Informer™ HDX largely complete, GPSI has been transitioning away from a research and development focus; however, GPSI will dedicate resources to new opportunities where market potential and economics justify investment.

GPSI has offices in the United States, Canada and United Kingdom with exclusive distributorships for Asia, South Africa, Australia and New Zealand. North America is the Debtor's current primary market.

In mid 2008, GPSI commenced consolidating its operations into leased headquarters in Sarasota, Florida, that had previously been divided between Vancouver, Canada and Austin, Texas. The relocation is substantially complete: Corporate, Finance, Sales, Customer Service and Repair/Maintenance are located in Sarasota; Software Development and Research, are located in Austin.

Subsidiaries of the Debtor which have **not** filed petitions for relief under the Bankruptcy Code: Direct Golf Services Inc. and Golf Academies Ltd. (collectively GPSI Europe).

See Section D below for Events Leading to the Chapter 11 Filing.

## B.    Insiders of the Debtor

| Name | Title(s) |
| --- | --- |
| Ben Porter | President |
| David Chessler | CEO/Director |

| | |
|---|---|
| Russell R. Lee | CFO/Director |
| Kevin Carpenter | Vice President |
| Seth Freedman | Vice President |
| David Saslow, Esq. | Vice President |
| Bart Collins | Director |
| DeClan Hogan | Director |
| Tony Sole | Director |
| Gregory J. Norman | |
| Great White Shark Enterprises, Inc. | |

## C. Management of the Debtor Before, During and After the Bankruptcy

1. **Management – Past two years:** During the two years prior to the Petition Date (July 31, 2009), the officers, directors, managers or other persons in control of the Debtor (collectively the "Managers") were:

Name and Principal Position

David Chessler, Chief Executive Officer[1]

Douglas J. Wood, Interim Chief Executive Officer [2]

Robert C. Silzer, Sr., Former Chief Executive Officer and President [3]

Joe Miller, Former Chief Financial Officer[4]

Russell R. Lee III, Chief Financial Officer[5]

Alex Doaga, Senior Vice President & CTO

1 On June 16, 2008, David Chessler was appointed by the Company's Board of Directors as Chief Executive Officer.

2. On November 29, 2007, Douglas J. Wood was appointed by the Company's Board of Directors as Interim Chief Executive Officer and Chairman of the Board. Mr. Wood was not compensated by the Company for this role. On March 27, 2008 Mr. Wood passed away.

[3]On November 29, 2007, Robert Silzer, Sr. resigned as a director, Chairman of the Board and Chief Executive Officer.

4. Effective August 31, 2008, Joe Miller resigned as Chief Financial Officer.

5.On September 30, 2008,Russell R.Lee III was appointed by the Company's Board of Directors as Chief Financial Officer.

2. **Management on July 31, 2009 and during Chapter 11 case:** The Managers of the Debtor during the pendency of the Debtor's chapter 11 case are (and will be):

| Name | Title(s) |
|---|---|
| Ben Porter | President |

| | |
|---|---|
| David Chessler | CEO/Director |
| Russell R. Lee | CFO/Director |
| Kevin Carpenter | Vice President |
| Seth Freedman | Vice President |
| David Saslow, Esq. | Vice President |
| Bart Collins | Director |
| DeClan Hogan | Director |
| Tony Sole | Director |

**3. Management Post-Confirmation of the Plan**: After the Effective date of the Order confirming the Debtor's Plan, the directors, officers, and voting trustees of the Debtor, any affiliate of the Debtor participating in a joint Plan with the Debtor, or successor of the Debtor under the Plan (collectively the "Post Confirmation Managers"), will be the same as during the pendency of the Chapter 11 case, as set forth in detail above.

## D.  Events Leading to Chapter 11 Filing

GPSI has incurred losses since its inception. The business has expended substantial funds in the research and development of its GPS systems, leading to the latest generation product, the Inforemer™ HDX. The cost of the research, development and marketing of the product lines has required large amounts of capital and on-going cash infusions.

Net loss was $30,881,000 for the year ended December 31, 2008 compared to $11,593,000 loss for 2007. The Company's 2008 net loss includes an intangible impairment charge of $14,324,000. The 2007 net loss included a deemed preferred stock dividend of $12,500,000 applicable to common shareholders and no intangible impairment was recorded during the 2007 period. As of December 31, 2008 the Company had a working capital deficiency of $18,403,000 compared to $5,172,000 as of December 31, 2007.

GPSI had substantial overhead and in mid 2008, the Company commenced consolidating its operations in Vancouver, Canada and Austin, Texas, into leased Sarasota, Florida headquarters. Despite reductions in administration and overhead expenses through a restructuring the business, the extensive debt and on-going losses are such that the Debtor was unable to pay its ongoing expenses as they come due, and in need of additional substantial cash infusion and new funding to support its business operations and to allow it to continue as a going concern. Debtor's secured creditors, senior note holders, private equity firms, and others have agreed to restructure the Company and infuse new capital to allow the Debtor to reorganize. The Company filed its Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code, on July 31, 2009.

## E.  Significant Events During the Bankruptcy Case

Concurrent with filing the Voluntary Petition, the Debtor filed a Motion seeking Court approval of Debtor's Motion For Interim And Final Orders (A) Authorizing Debtor-In Possession To Obtain Post-Petition Financing And Accord Super-Priority Status Pursuant To Sections 105, 361, 362, 363 And 364 Of The Bankruptcy Code; (B) Authorizing Use Of Cash Collateral And Affording

Adequate Protection Pursuant To Sections 105, 361, 363 And 364 Of The Bankruptcy Code; (C) Scheduling Final Hearing To Consider Final Post-Petition Financing And Use Of Cash Collateral; And (D) Prescribing Form And Manner Of Notice Therefore (the "DIP Financing Motion").

The Debtor has secured Debtor in Possession financing of up to $1,300,000.00 (the "DIP Financing") from Tulip Group Investments, Limited ("DIP Lender"), to permit it to meet its financial obligations through confirmation. The Debtor has actively negotiated prior to the filing of its Petition, with all of its secured creditors' and with other third parties for future sources of cash infusion for post-confirmation operations. The Debtor anticipates that in light of the pre-petition negotiations and agreements, that the Debtor will be able to confirm a plan of reorganization within approximately 90 days, and has filed the Plan and Disclosure Statement within the first week of the filing of the case. The Debtor has also sought authority to pay pre-petition wages and officers' salaries, at the same level as were paid prior to the bankruptcy case.

### F. Projected Recovery of Avoidable Transfers

To the best of the Debtor's current knowledge and information, the Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions, as none are known.

However, the Debtor has not yet completed its investigation with regard to prepetition transactions. If you received a payment or other transfer within 90 days of the bankruptcy, or other transfer avoidable under the Code, the Debtor may seek to avoid such transfer.

### G. Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

### H. Current and Historical Financial Conditions

The identity and fair market value of the Debtor's estate's assets as of the Petition Date, are listed in **Exhibit "B"** to this Disclosure Statement.

The Debtor's most recent financial statements issued before the filing of the Bankruptcy petition, specifically the 10-Q for the first quarter, 2009, is attached as **Exhibit "C"** to this Disclosure Statement.

Financial projections and/or the most recent post-petition operating report filed since the commencement of the Debtor's bankruptcy case (as available) is attached as **Exhibit "D"** to this Disclosure Statement.

## III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

### A. What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B. Unclassified Claims

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object, if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has *not* placed the following claims in any class:

1. Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After Petition Date | $1,000,000.00 | Paid in full on the Effective Date of the Plan, Pursuant to the terms of the DIP Financing Agreement |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | unknown | Paid in full on the effective date of the Plan, or according to terms of obligation, if later |
| Professional Fees, as approved by the Court. | None anticipated above the retainer given prior to the filing of the petition | Paid in full on the effective date of the Plan, or according to separate written agreement, or according to court order if such fees have not been approved by the Court on the effective date of the Plan |
| Clerk's Office Fees | None | Paid in full on the effective date of the Plan |
| Other administrative expenses | Rent | Paid in full on the effective date of the Plan or according to separate written agreement |
| Office of the U.S. Trustee Fees | | Paid in full on the effective date of the Plan |
| TOTAL | | |

2.      Priority tax claims are unsecured income, employment, and other taxes described by section 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

The Debtor's total estimated tax liability is less than $500, and will be paid in full at confirmation.

### C.      Classes of Claims and Equity Interests

The following are the **classes** set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1.      **Secured Claims**: Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to set-off) to the extent allowed as secured claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

**(THIS SECTION INTENTIONALLY LEFT BLANK)**

The following chart lists all classes containing Debtor's secured prepetition claims and their proposed treatment under the Plan:

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---|---|---|---|---|
| **Class 2(A)**<br>*Secured claim of:*<br>Citi-Captial Commercial Corp.<br><br>*Allowed Secured Amount*<br>$2,583,251.79 | This claim is secured by GPS Systems deployed at several golf courses and a cash hold back in the amount of approximately $800,000.00 that is in the possession of Citi-Capital. | No | Impaired | The secured portion of this claim shall be paid pursuant to the terms of its agreements with the Debtor. Any unsecured portion of this claim shall be treated as a Class 3 Claim. |
| **Class 2(B)**<br><br>*Secured Claim of:*<br>Doug Wood Holdings, LLC<br><br>Allowed Secured Amount<br>$2,337,000.00 | This claim is secured by a subordinated lien upon the majority of the assets of the Debtor | No | Impaired | Due to the fact that the senior secured debt is substantially greater than the value of the collateral that secures this claim it shall be treated as a general unsecured claim under section 3(A) of the plan. |
| **Class 2(C)**<br><br>*Secured Claim of:*<br>Doug Wood Holdings, LLC<br><br>*Allowed Secured Amount*<br>$750,000.00 | This claim is secured by a blanket lien upon the assets of the Debtor. | No | Impaired | This claim shall be converted to equity (1.52%) in the Reorganized Debtor. |
| **Class 2(D)**<br><br>*Secured Claim of:*<br>Great White Shark Enterprises, LLC<br><br>*Allowed Secured Amount*<br>$3,500,000.00 | This claim is secured by a blanket lien upon the assets of the Debtor. | Yes | Impaired | This claim shall be converted to equity (7.48%) in the Reorganized Debtor. |
| **Class 2(E)**<br><br>*Secured Claim of:*<br>Green Tulip Enterprises, Ltd.<br><br>*Allowed Secured Amount*<br>$400,000.00 | This claim is secured by a blanket lien upon the assets of the Debtor. | No | Impaired | This claim shall be converted to equity (.84%) in the Reorganized Debtor. |

| | | | Impaired | |
|---|---|---|---|---|
| **Class 2(F)**<br><br>*Secured Claim of:*<br>Hansen, Inc.<br><br>*Allowed Secured Amount*<br>$1,500,000.00 | This claim is secured by a blanket lien upon the assets of the Debtor. | No | Impaired | This claim shall be converted to equity (3.04%) in the Reorganized Debtor. |
| **Class 2(G)**<br><br>*Secured Claim of:*<br>Microsoft Capital Corp.<br><br>*Allowed Secured Amount* $6,041.00 | Contract | No | Uimpaired | This claim shall be paid according to contract terms and its lien rights shall not be modified by the plan. |
| **Class 2(H)**<br><br>*Secured Claim of:*<br>Tulip Investments, Limited<br><br>*Allowed Secured Amount*<br>$5,500,000.00 | This claim is secured by a blanket lien upon the assets of the Debtor. | No | Impaired | This claim shall be converted to equity (11.86%) in the Reorganized Debtor. This claim is secured by a blanket lien upon the assets of the Debtor. |
| **Class 2(I)**<br><br>*Secured Claim of:*<br>Optimal IP Holdings LP<br><br>*Allowed Secured Amount*<br>$1,794,227.05 | This claim is secured by the so-called "093 Patent". | No | Impaired | The Debtor shall pay the allowed secured claim via even monthly payment over 5 years with 5% interest, beginning 60 days after the effective date. Any remaining unsecured portion of this claim shall be treated under Class 3(A). |

2.      **Priority Claims**: Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment. There are no known priority claims at this time.[1] In the event there are priority claims, the allowed priority claims are impaired, and are entitled to vote on the Plan.

3.      **Classes of General Unsecured Claims:** General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

---

[1] In the event that the Bankruptcy Court does not grant the Debtor's Motion to Pay Prepetition Wages, the Debtor may have approximately $200,000 in priority claims.

The following chart identifies the Plan's proposed treatment of Classes 3A and 3B, which contain general unsecured claims against the Debtor:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| Class 3(A) | General Unsecured Class | Impaired | Upon the Effective Date the Reorganized Debtor shall set aside the sum of **$200,000.00** for the payment of these claims, and the holders of allowed unsecured claims shall receive a pro-rata distribution from this fund as soon as is practical under the circumstances. |
| Class 3(B) | General Unsecured Class -1122(b) Convenience Class | Impaired | The holder of any Class 3(A) claim may elect, to convert their claim to a Class 3(B) claim. These claims shall be paid (a) the lesser of the actual amount of the claim or (b) $500, in full satisfaction of the claim. This payment shall be made within 120 days from the Effective Date of the Plan. |

### 4. Classes of Equity Interest Holders

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtor.

The following chart sets forth the Plan's proposed treatment of the classes of equity interest holders:

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| Class 4 | Equity Security Holders of the Debtor | Impaired | All existing equity shall be cancelled pursuant to the terms of the Plan. |

### D. Means of Implementing the Plan

The Debtor has secured Debtor in Possession financing of up to $1,300,000.00 (the "DIP Financing") from Tulip Group Investments, Limited ("DIP Lender"), to permit it to meet its financial obligations through confirmation.

Pursuant to the terms of the DIP Financing and the Plan, DIP Lender shall receive 75.26% of the equity in the reorganized debtor and the holders of the first position blanket lien upon the majority of the assets of the Debtor (the "Secured Creditors") shall receive 24.74% of the equity of the reorganized debtor in full satisfaction of their respective secured claims. The reorganized debtor shall have until December 31, 2009 within which it may redeem the 75.26% stake in the

reorganized debtor (the "Option Period") in exchange for payment of the outstanding balance due under the terms of the DIP Financing Agreement. If the option is not timely exercised, the DIP Financing shall be deemed paid in full upon the expiration of the Option Period. All existing equity in the debtor shall be cancelled.

The Post-Confirmation Managers of the Debtor and their compensation, shall be the same as exists during the pendency of the bankruptcy case.

### E. Risk Factors

The proposed Plan has the following risks:

As to general unsecured creditors, (Classes 3(A) and 3(B)) the risk is limited to the ability of the Debtor to confirm its Plan in a short time period. As the funds to pay these Class 3(A) and 3(B) creditors is expressly provided for under the DIP Financing Agreement, the general unsecured creditors will secure their plan payment fund upon confirmation of the Plan. Debtor believes it can confirm its Plan by September 30, 2009. If the Debtor is able to confirm the Plan in this time frame, the Debtor believes it will have sufficient funds to meet its cash flow needs, during the pending of the Bankruptcy case. In the event that the Plan is not confirmed in the anticipated time frame, the Debtor may be unable to confirm its proposed Plan and the general unsecured creditors may then receive no distribution on their claims. As to Secured Creditors, the risk factors of the proposed Plan relate to the viability of the future business of the Debtor, as the Secured Creditors' debt will be converted to equity in the reorganized Debtor.

Post-confirmation of the Plan, the Debtor requires a substantial amount of new funding to meet its cash requirements. At this time, the Debtor has identified, but does not have firm commitments from, certain sources for additional capital. Historically, particular officers and directors or their affiliates have facilitated or provided capital for the Debtor; they are not legally required to do so in the future. There can be no assurances that additional capital will be available on acceptable terms. If the Debtor is unable to negotiate additional financing on satisfactory terms, such would have a materially adverse effect on the Debtor's business and financial position and could cause the business to cease some or all of its operations.

The Debtor depends on GPS technology owned and controlled by others. The Debtor's services rely on signals from GPS satellites built and maintained by the U.S. Department of Defense and others and may be subject to electronic and mechanical failures and sabotage. If one or more satellites malfunction, there could be a substantial delay before they are repaired or replaced, if at all, and the Debtor's services may cease and customer satisfaction would suffer. In addition, the U.S. government could decide not to continue to operate and maintain GPS satellites over a long period of time or to charge for the use of GPS. Furthermore, other U.S. government agencies may become involved in the administration or the regulation of the use of GPS signals in the future.

The Debtor's GPS technology depends on the use of radio frequency spectrum controlled by others. The assignment of spectrum is controlled by an international organization known as the International Telecommunications Union ("ITU"). The Federal Communications Commission

("FCC") is responsible for the assignment of spectrum for non-government use in the United States in accordance with ITU regulations. Any ITU or FCC reallocation of radio frequency spectrum, including frequency band segmentation or sharing of spectrum, could cause interference with the reception of GPS signals and may materially and adversely affect the utility and reliability of the Debtor's products, which would, in turn, cause a material adverse effect on its operating results. In addition, emissions from mobile satellite service and other equipment operating in adjacent frequency bands or in-band may materially and adversely affect the utility and reliability of the Debtor's products, which could result in a material adverse effect on its operating results.

In addition, the Debtor may also be subject to direct regulation by governmental agencies, including the FCC and Department of Defense. A number of legislative and regulatory proposals under consideration by federal, state, provincial, local and foreign governmental organizations may lead to laws or regulations concerning various aspects of wireless communications and GPS technology. Additionally, it is uncertain how existing laws governing issues such as taxation, intellectual property, libel, user privacy and property ownership, will be applied to the Debtor's services. With the adoption of new laws, the application of existing laws may expose the Debtor to significant liabilities and additional operational requirements, which could decrease the demand for the Debtor's services and increase its cost of doing business.

On May 11, 2000, the FCC issued a Notice of Proposed Rulemaking that proposes rules for the operation of Ultra-Wideband or UWB radio devices on an unlicensed basis in the frequency bands allocated to GPS. If the FCC issues final rules authorizing such operation, UWB devices might cause interference with the reception of GPS signals. Such interference could reduce demand for GPS products in the future. Any resulting change in market demand for GPS products could have an adverse effect on the Debtor's financial results.

The Debtor's performance and ability to complete are dependent to a significant degree on its proprietary technology. The Debtor holds 31 patents and has 8 additional patents pending covering several areas. There can be no assurance that pending patent applications will be allowed or that any of the Debtor's patents will provide absolute protection for its products. The Debtor expects to file additional patent applications to protect it proprietary designs. Despite efforts to protect its proprietary rights, unauthorized parties may attempt to copy aspects of the Debtor's products or to obtain and use information that the Debtor regards as proprietary. There can be no assurance that the measures taken by the Debtor to protect its proprietary technology, will preclude competitors from developing products similar to the Debtor's products. In addition, effective patent, copyright, trademark, and trade secret protection may be unavailable or limited in certain foreign countries. In addition, in the future, the Debtor may also need to file lawsuits to enforce its intellectual property rights. Such litigation, whether successful or unsuccessful, could result in substantial costs and diversion of resources, which could have a material adverse effect on the Debtor. The failure of the Debtor to protect its proprietary information would have a material adverse effect on the Debtor's business, financial condition, and results of operations.

While the Debtor believes that its products and trademarks do not infringe upon the proprietary rights of third parties, there can be no assurance that the Debtor will not receive future communications from third parties asserting that without merit, could result in costly, time-

consuming litigation and diversion of technical and management resources.

The Debtor has competition in all aspects of its business. The Debtor competes for customers with other electronics and recreation companies, many of which have substantially greater assets and resources than the Debtor.

## F.     Executory Contracts and Unexpired Leases

The Plan, in Section 6.1, lists all executory contracts and unexpired leases that the Debtor will assume under the Plan.  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in Exhibit 6.1 will be rejected under the Plan.  Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

**The Deadline for filing a proof of claim based on a claim arising from the rejection of a lease or contract, is 30 days after entry of the Court order granting the Debtor's motion to reject the lease or contract.** Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

## G.     Tax Consequences of Plan

**Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.**

**No analysis of the Federal tax consequences of confirmation of the Plan has been made and you should consult with your own tax expert to determine what, if any, tax consequences may result from confirmation of the Debtor's Plan of Reorganization.**

## IV.     CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in Sections1129(a) or (b) of the Bankruptcy Code.  The requirements include that:  the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity

interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These are also additional requirements for confirmation of a Plan listed in Section 1129.

### A. Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Certain parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

**In this case, the Plan Proponent believes that the following classes are impaired:**

> **Class 1-Priority Claims (if any)**
> **Classes 2(A), 2(B), 2(C), 2(D), 2(E), 2(F), 2(H) and 2(I) - secured claims;**
> **Class 3(A) - General Unsecured Claims; and**
> **Class 3(B) - Convenience Class for General Unsecured Claims; and**
> **Class 4- Equity all classes.**

Holders of allowed claims in each of **the impaired classes listed above are entitled to vote** to accept or reject the Plan.

The Plan Proponent believes that **Class 2(G) is unimpaired** and the Class 2(G) claimant does not have the right to vote to accept or reject the Plan.

Only a creditor or equity interest holder with an **allowed claim** or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, that creditor or equity interest holder cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

**The deadline for filing a proof of claim in this case is _____, 2009.** The Debtor shall have 60 days following entry of the Court's Order confirming the Debtor's Plan to file objections to claims, or such other deadline as the Court may set.

2. As described above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is **impaired** under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

3.      The holders of the following five types of claims and equity interests are **not** entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;
- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.
- holders of claims or equity interests in unimpaired classes;
- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;
- holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and
- administrative expense claims.

**Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.**

4.      A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

**B.      Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed below in Section B.2.

1.      A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

2.      Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds non-accepting classes is commonly referred to as a "cramdown" plan. The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

**You should consult your own attorney if a cramdown confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.**

### C.    Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. Attached to this Disclosure Statement as **Exhibit "B"**, is a chart of the maximum value of the material assets of the Debtor. As all the assets of the Debtor are subject to liens and encumbrances, in a chapter 7 case, unsecured creditors would receive no distribution. The Debtor's financial projections are attached hereto as **Exhibit "C"**. The projections are irrelevant to the risk of nonpayment to the general unsecured.

### D.    Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

The Debtor believes that it will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses that are entitled to be paid on that date. The Debtor must also show that it will have enough cash over the life of the Plan to make the required future Plan payments, if any, and operate without future reorganization. The Debtor has provided projected financial information. Those projections are listed in **Exhibit "D."**

**You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.**

### V.    EFFECT OF CONFIRMATION OF PLAN

### A.    Discharge of Debt

Except as otherwise expressly provided in the Plan or in the confirmation order, the confirmation order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the effective date of the Plan, of any and all debts of, and claims of any nature whatsoever against the Debtor that arose at any time prior to the confirmation date, including any and all claims for principal and interest, whether accrued before, on or after the Petition Date.

### B.    Modification of Plan

The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or re-voting on the Plan.

The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Court authorizes the proposed modifications after notice and a hearing.

### C.    Final Decree

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the reorganized Debtor, or such other party as the Court shall designate in the Plan confirmation order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such a final decree on its own motion.

## VI.    OTHER PLAN PROVISIONS

### General Provisions

**Revestment of Reorganized Debtor.** On the Effective Date of the Plan, except as otherwise expressly provided in the Plan, the reorganized Debtor shall be revested with all of their assets free and clear of any and all liens, debts, obligations, claims, cure claims, liabilities, equity interests, and all other interests of every kind and nature (except for any permitted encumbrances), and the confirmation order shall so provide.

**Section 1146 Exemption.** Pursuant to Section 1146(c) of the Bankruptcy Code, the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan or any Plan document, or the re-vesting, transfer, or sale of any real or personal property of, by, or in the Debtor or the reorganized Debtor pursuant to, in implementation of, or as contemplated by the Plan or any Plan document shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee.

**General Causes of Action.** On the Effective Date, the Reorganized Debtor shall retain all causes of action, except to the extent a creditor or other third party has been specifically released from any cause of action that the estate may have by the terms of the Plan or by Bankruptcy Court order. Neither a vote to accept the Plan by any creditor nor the entry of the confirmation order will result in the waiver or release of any of the estate's causes of action against such creditor. Confirmation of the Plan and entry of the confirmation order are not intended to and shall not be deemed to have any *res judicata* or other effect which would preclude or inhibit prosecution of such causes of action following confirmation of the Plan, whether specified in this Plan or otherwise.

**Settlement of Causes of Action.** The reorganized Debtor may settle any cause of action with the approval of the Bankruptcy Court.

**Adversary Proceeding(s).** In the event that an adversary proceeding is filed against the Debtor, such shall be deemed dismissed with prejudice on the effective date of the Plan, with each party to bear its own costs and attorney's fees in conjunction with such proceeding. All issues and controversies shall be deemed fully settled and resolved upon confirmation, with each of such parties having fully released each other from any and all claims and defenses whatsoever in conjunction with their claims, other than as specifically set forth in this Plan, or the order confirming the Plan.

**Dismissal of Lawsuits.** All lawsuits filed against the Debtor shall be deemed dismissed with prejudice on the Effective Date, with each party to bear its own costs and attorney's fees in conjunction with such lawsuits. All issues and controversies shall be deemed fully settled and resolved upon confirmation, with each of such parties having fully released each other from any and all claims and defenses whatsoever, other than as specifically set forth in this Plan, or the order confirming the Plan..

## VII.        PROVISIONS GOVERNING DISTRIBUTIONS

**Distributions.** Each holder of an allowed claim shall be paid as provided by this Plan; provided however, that if, on the Distribution Date, any disputed claims remain, then the reorganized Debtor shall withhold payment in respect of any disputed claim until a final order has been entered by the Bankruptcy Court resolving such disputed claim.

**Unclaimed Distributions.**

       (a)     If the holder of an allowed claim fails to negotiate a check issued to such holder within ninety (90) days of the date such check was issued, then the reorganized Debtor shall provide written notice to such holder stating that unless such holder negotiates such check within thirty (30) days of the date of such notice, the amount of cash attributable to such check shall be deemed to be unclaimed, such holder's claim shall no longer be deemed to be allowed, and such holder shall be deemed to have no further claim in respect of such check and shall not participate in any further distributions under the Plan.

       (b)     If a distribution pursuant to the Plan to any holder of an allowed claim is returned to the reorganized Debtor due to an incorrect or incomplete address for the holder of such allowed claim, and no claim is made to the reorganized debtor as to such distribution within one hundred twenty (120) days of the return of such distribution, then the amount of cash attributable to such distribution shall be deemed to be unclaimed and such holder shall be deemed to have no further claim in respect of such distribution and shall not participate in any further distributions under the Plan.

       (c)     Any unclaimed distribution as described above shall be donated to [CHARITABLE ORGANIZATION]

**Transfer of Claim.** In the event that the holder of any claim shall transfer such claim on and after the Effective Date, it shall immediately advise the reorganized Debtor in writing of such transfer. The reorganized Debtor shall be entitled to assume that no transfer of any claim has been made by any holder unless and until the reorganized Debtor shall have received written notice to the contrary. Each transferee of any claim shall take such claim subject to the provisions of the Plan and to any request made, waiver or consent given, or other action taken hereunder and, except as otherwise expressly provided in such notice, the reorganized Debtor shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers of the transferor under the Plan.

**Determination of Claims.**

(a) Following the effective date of the Plan and except as may otherwise be provided herein, the reorganized Debtor shall have standing to and may object to any administrative claim, priority claim, priority tax claim, secured claim, and unsecured claims. Unless otherwise ordered by the Bankruptcy Court, and except as to any late-filed claims and claims resulting from the rejection of executory contracts or unexpired leases, all objections to claims shall be filed with the Bankruptcy Court on or before sixty (60) days following the effective date (unless such period is extended by the Bankruptcy Court upon motion of the reorganized Debtor), and the confirmation order shall contain appropriate language to that effect.

(b) Disputed claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. §157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated claim would cause undue delay in the administration of the reorganization case, such claim shall be estimated by the Bankruptcy Court for purposes of allowance and distribution. Upon receipt of a timely-filed Proof of Claim, the Debtor or other party in interest may file a request for estimation along with its objection to the claim set forth therein. The determination of claims in estimation hearings shall be binding for purposes of establishing the maximum amount of the claim for purposes of allowance and distribution. Procedures for specific estimation hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the disputed claim.

**De Minimis Distributions on Account of Allowed Claims.** To avoid the disproportionate expense and inconvenience associated with making distributions in amounts of less than one dollar ($1.00) each with respect to allowed claims, the reorganized Debtor shall not be required to make, and shall be excused from making, distributions in amounts of less than $1.00 each to holders of allowed claims.

## VIII. CONDITIONS PRECEDENT

**Condition Precedent to Confirmation of the Plan.** The Bankruptcy Court shall not enter the confirmation order, confirmation of the Plan shall not be effective, and the Debtor shall not be obligated to consummate the Plan, unless the Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the confirmation order in a manner consistent with the provisions of the Plan and in form and substance satisfactory to the Debtor.

**Condition Precedent to Effective Date.** The Plan shall not be consummated and the effective date shall not occur until the Bankruptcy Court has entered the confirmation order, in form and substance satisfactory to the Debtor, on the docket of this case, and no stay of the confirmation order shall be in effect.

**Waiver of Conditions Precedent.** The Debtor may elect to waive any condition precedent set forth above that has not been satisfied on or before the date of the confirmation hearing.

## IX.    INJUNCTION, EXCULPATION AND RELEASE PROVISIONS

**General Injunction.** Pursuant to Sections 105, 1123, 1129, and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the confirmation date, except as otherwise provided in the Plan or in the confirmation order, all persons or entities that have held, currently hold or may hold a claim or other debt or liability, that is discharged pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged claims, debts or liabilities, other than actions brought to enforce any rights or obligations under the Plan or the Plan documents: (a) commencing or continuing in any manner any action or other proceeding against the Debtor, the reorganized Debtor, or its respective properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the reorganized Debtor, or their assets; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtor, the reorganized Debtor, or their assets; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability or obligation due to the Debtor or the reorganized Debtor; or (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the confirmation order. The Debtor and the reorganized Debtor shall have the right to independently seek enforcement of this general injunction provision. This general injunction provision is an integral part of the Plan and is essential to its implementation.

**Exculpation from Liability.** The Debtor, the reorganized Debtor, its respective directors, officers, employees, agents, representatives, accountants, attorneys, and professionals (acting in such capacity), and their respective heirs, executors, administrators, successors, and assigns, will neither have nor incur any liability whatsoever to any person or other entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, any Plan document, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the reorganization case. The rights granted herein are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Debtor, the reorganized Debtor, and its respective agents have or obtain pursuant to any provision of the Bankruptcy Code. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation.

**Release.** To the extent permitted under the Bankruptcy Code, on the Effective Date of the Plan, the post confirmation Debtor shall be unconditionally and hereby is deemed to be unconditionally released from any and all claims, obligations, suits, judgments, damages, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence taking place between the Petition Date and the Effective Date, which is in any way relating to the Debtor, this reorganization case, any assets of the Debtor, the business or operations of the Debtor, the Plan, or any of the transactions contemplated thereby. The confirmation order shall enjoin the prosecution by any person or entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the released parties, except as otherwise

provided in the Plan, the Plan documents or the confirmation order. Each of the released parties shall have the right to independently seek enforcement of this release provision. This release provision is an integral part of the Plan and is essential to its implementation.

**Mutual Release.** In consideration of the payments and other things of value agreed to under the Plan, each creditor with an allowed claim hereby releases each other creditor from all claims, known or unknown, against each other in relation to the obligations, if any, among the creditors with allowed claims with respect to debts claimed in this proceeding to be owed to them by the Debtor.

**Term of Certain Injunctions and Automatic Stay.** All injunctions or automatic stays provided for in the reorganization case pursuant to Sections 105, 362, or other applicable provisions of the Bankruptcy Code, or otherwise, and in existence on the confirmation date, shall remain in full force and effect until the effective date. Any preliminary or permanent injunction entered by the Bankruptcy Court shall continue in full force and effect following the confirmation date and the final decree date, unless otherwise ordered by the Bankruptcy Court.

### Untimely Claims Provisions

**No Liability for Tax Claims.** Unless a taxing governmental authority has asserted a claim against the Debtor before the bar date or administrative expense claims bar date established with respect to such claim, no claim of such governmental authority shall be allowed against the Debtor or the reorganized Debtor for taxes, penalties, interest, additions to tax, or other charges arising out of the failure, if any, of the Debtor, any of his affiliates, or any other person or entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or arising out of an audit of any return for a period before the Petition Date.

**No Liability for Untimely Administrative Expense Claims.** Holders of administrative expense claims (including holders of any claims for post-petition federal, state or local taxes) that do not file an application or other Bankruptcy Court-approved pleading by the administrative expense claims bar date shall be forever barred from asserting such administrative expense claims against the Debtor, the reorganized Debtor, or any of its respective properties.

## X.    RETENTION OF JURISDICTION

**General Retention.** Notwithstanding the entry of the confirmation order and the occurrence of the effective date, until the reorganization case is closed, the Bankruptcy Court shall retain the most full and extensive jurisdiction of the reorganization case that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

**Specific Purposes.** In addition to the general retention of jurisdiction set forth in this Plan, after confirmation of the Plan and until the reorganization case is closed, the Bankruptcy Court shall retain jurisdiction of the reorganization case for the following specific purposes:

(a) to allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any claim or equity interest, including the resolution of any application for an administrative expense, and to determine any and all objections to the allowance or

priority of claims or equity interests;

(b) to determine any and all cases, controversies, suits or disputes arising under or relating to the Plan or the confirmation order (including regarding the effect of any release, discharge, or injunction provisions provided for herein or affected hereby and regarding whether conditions to the consummation and/or effective date of the Plan have been satisfied) and to enforce the obligations under the Plan;

(c) to determine any and all applications for allowance of compensation of professionals and reimbursement of expenses under Section 330, 331 or 503(b) of the Bankruptcy Code arising out of or relating to the reorganization case; provided, however, that this retention of jurisdiction shall not require prior Bankruptcy Court approval of the payment of fees and reimbursement of expenses of professionals after confirmation of the Plan unless an objection to such fees and expenses has been made by the Debtor or the reorganized Debtor;

(d) to determine any and all motions pending as of the date of the Confirmation Hearing (including pursuant to the Plan) for the rejection, assumption or assignment of executory contracts or unexpired leases to which the Debtor is a party or with respect to which the Debtor may be liable (including assumed contracts), and to determine the allowance of any claims resulting from the rejection thereof or any amount necessary to cure defaults in any assumed and/or assigned executory contracts or unexpired leases (including assumed contracts), including cure claims;

(e) to determine any and all motions, applications, adversary proceedings, contested or litigated matters, causes of action, and any other matters involving the Debtor or the reorganized Debtor commenced in connection with, or arising during, the reorganization case and pending on the Effective Date, including approval of proposed settlements thereof;

(f) to enforce, interpret, and administer the terms and provisions of the Plan and the Plan documents;

(g) to modify any provisions of the Plan to the fullest extent permitted by the Bankruptcy Code and the Bankruptcy Rules;

(h) to consider and act on the compromise and settlement of any claim against or equity interest in the Debtor or the estate;

(i) to assure the performance by the reorganized Debtor of its obligations to make distributions under the Plan;

(j) to correct any defect, cure any omission, reconcile any inconsistency, and make any other necessary change or modification in or to the Disclosure Statement, the Plan, the Plan documents, the Confirmation Order, or any exhibits or schedules to the foregoing, as may be necessary or appropriate to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan in the event the effective date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

(k) to resolve any disputes concerning any release of a nondebtor hereunder or the injunction

against acts, employment of process, or actions against such nondebtor arising hereunder;

(l) to enforce all orders, judgments, injunctions, and rulings entered in connection with this reorganization case;

(m) to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement (if required),or the confirmation order, including the Plan documents;

(n) to review and approve any sale or transfer of assets or property by the Debtor or the reorganized Debtor, including prior to or after the date of the Plan, and determine all questions and disputes regarding such sales or transfers;

(o) to determine all questions and disputes regarding title to the assets of the Debtor, the estate, or the reorganized Debtor;

(p) to determine any motions or contested matters relating to the causes of action, whether brought before or after the effective date;

(q) to determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to the Debtor arising on or prior to the effective date or arising on account of transactions contemplated by the Plan;

(r) to resolve any determinations which may be requested by the Debtor or the reorganized Debtor of any unpaid or potential tax liability or any matters relating thereto under Sections 505 and 1146(d) of the Bankruptcy Code, including tax liability or such related matters for any taxable year or portion thereof ending on or before the effective date;

(s) to issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any person or entity with consummation, implementation or enforcement of the Plan or the confirmation order;

(t) to enter and implement such orders as are necessary or appropriate if the confirmation order is for any reason modified, stayed, reversed, revoked, or vacated;

(u) to determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement (if required), the confirmation order, or the Plan documents;

(v) to enter such orders as are necessary to implement and enforce the injunctions described herein;

(w) to determine such other matters and for such other purposes as may be provided for in the confirmation order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law; and

(x) to enter an order concluding and terminating the reorganization case.

**Closing of the Reorganization Case.** In addition to the retention of jurisdiction set forth above, the Bankruptcy Court shall retain jurisdiction of the reorganization case to enter an order reopening the reorganization case after it has been closed.

## MISCELLANEOUS PROVISIONS

**No Admissions.** The Plan provides for the resolution, settlement and compromise of claims against and equity interests in the Debtor. Nothing herein shall be construed to be an admission of any fact or otherwise binding upon the Debtor in any manner prior to the Effective Date.

**Revocation or Withdrawal of the Plan.** The Debtor reserves the right to revoke or withdraw the Plan prior to the confirmation date. If the Debtor revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then the Plan shall be deemed null and void in all respects and nothing contained in the Plan shall be deemed to (a) constitute a waiver or release of any claims by or against, or equity interests in, the Debtor or any other person, or (b) prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

**Settlement of Claims.** The reorganized Debtor (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any claim or cause of action which the Debtor in possession had or had power to assert immediately prior to the confirmation date, and (b) may settle or adjust such claim or cause of action.

**Standard for Approval by the Bankruptcy Court.** In the event any of the matters described herein are brought for approval before the Bankruptcy Court, then any such approval shall mean the entry of an order by the Bankruptcy Court approving the matter using the standards for approval of similar matters by a Chapter 11 Debtor in possession.

**Further Assurances.** The Debtor or the reorganized Debtor (as the case may be) agrees and is authorized to execute and deliver any and all papers, documents, contracts, agreements, and instruments that may be necessary to carry out and implement the terms and conditions of the Plan.

**Headings.** The headings and table of contents used in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose or in any manner affect the construction of the provisions of the Plan.

**Notices.** All notices, requests, or other documents in connection with or required to be served by the Plan shall be in writing and shall be sent by first class United States mail, postage prepaid, or by overnight delivery by a recognized courier service, to:

If to the Debtor or the Reorganized Debtor:

GPSI Industries, Inc.,
Attn: David Chessler
1358 Fruitville Road
Sarasota, FL 34236

with a mandatory copy to:

McIntyre, Panzarella, Thanasides,
  Eleff & Hoffman, P. L.
6943 E. Fowler Avenue
Tampa, Florida, 33617

**Contemporaneous Service.** Copies of all notices under the Plan to any party shall be given to the Debtor and the reorganized Debtor and its counsel, contemporaneously with the giving of notice to such party.

**Changes of Address.** Any entity may change the person or address to whom or to which notices are to be given hereunder by filing a written instrument to that effect with the Bankruptcy Court and serving same on the parties set forth above.

**Governing Law.** Except to the extent that federal law (including the Bankruptcy Code or the Bankruptcy Rules) is applicable, or to the extent that the Plan or the provision of any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, construed, and enforced in accordance with the laws of the State of Florida, without giving effect to the principles of conflicts of law thereof.

**Limitation of Allowance.** No attorneys' fees, punitive damages, penalties, special damages, lost profits, treble damages, exemplary damages, or interest shall be paid with respect to any claim or equity interest except as specified herein or as allowed by a Final Order of the Bankruptcy Court.

**Estimated Claims.** To the extent any Claim is estimated for any purpose other than for voting, then in no event shall such Claim be allowed in an amount greater than the estimated amount.

**Consent to Jurisdiction.** Upon any default under the Plan, the Debtor and the reorganized Debtor consent to the jurisdiction of the Bankruptcy Court, or any successor thereto, and agree that it shall be the preferred forum for all proceedings relating to any such default. By accepting any distribution or payment under or in connection with the Plan, by filing any Proof of Claim, by filing any cure claim, by voting on the Plan, or by entering an appearance in the reorganization case, all creditors and other parties in interest, including foreign creditors and foreign parties in interest, have consented, and shall be deemed to have expressly consented, to the jurisdiction of the Bankruptcy Court for all purposes with respect to any and all matters relating to, arising under or in connection with the Plan or the reorganization case, including the matters and purposes set forth in this Plan. The Bankruptcy Court shall maintain jurisdiction to the fullest extent allowed under applicable law over all matters set forth in this Plan.

**Setoffs.** Subject to the limitations provided in Section 553 of the Bankruptcy Code, the Debtor may, but shall not be required to, set off against any claim and the payments or other distributions to be made pursuant to the Plan in respect of such claim, claims of any nature whatsoever the Debtor may have against the holder of such claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such claim that the Debtor may have against such holder.

**Successors and Assigns.** The rights, benefits, duties, and obligations of any person named or referred to in the Plan shall be binding upon and shall inure to the benefit of any heir, executor, administrator, successor, or assign of such person.

**No Postpetition Interest.** Except as expressly stated in the Plan or otherwise allowed by a Final Order of the Bankruptcy Court, no holder of an allowed claim shall be entitled to the accrual of postpetition interest or the payment of postpetition interest, penalties, or late charges on account of such claim for any purpose.

**Modification of Payment Terms.** The reorganized Debtor reserves the right to modify the treatment of any allowed claim, as provided in Section 1123(a)(4) of the Bankruptcy Code, at any time after the effective date, upon the consent of the holder of such allowed claim.

**Entire Agreement.** The Plan and Plan documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No person shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

**Severability of Plan Provisions.** If, prior to confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The confirmation order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**Confirmation Order and Plan Control.** To the extent the confirmation order or the Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Debtor and any third party, unless otherwise expressly provided in the Plan, the Plan controls the Disclosure Statement and any such agreements, and the confirmation order (any and other orders of the Court) shall be construed together and consistent with the terms of the Plan.

**Computation of Time.** In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

*    *    *    *

**GPS Industries, Inc.,**

By:/s/ David Chessler, CEO
    David Chessler, Chief Executive Officer

## INDEX OF EXHIBITS

EXHIBIT A –Proposed Plan of Reorganization

EXHIBIT B- Identity and Value of Material Assets of Debtor

EXHIBIT C- Cash on hand on the effective date of the plan

EXHIBIT D-Projections of Cash Flow and Earnings for Post-Confirmation Period

Exhibit A

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

GPS Industries, Inc.,                     Case No.: 8:09-bk-16766-CPM
                                          Chapter: 11

_____Debtor._____/

PLAN OF REORGANIZATION FOR
GPS INDUSTRIES, INC.

Richard J. McIntyre, Esquire
McIntyre, Panzarella, Thanasides,
   Eleff & Hoffman, P.L.
6943 E. Fowler Avenue
Tampa, Florida 33617

August 5, 2009

# ARTICLE I
## SUMMARY

This Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of GPS Industries (the "Debtor") from an infusion of capital, loan proceeds, and cash flow from operations.

This Plan provides for nine classes of secured claims; one class of priority claims; two classes of general unsecured claims; and one class of equity security holders. Unsecured creditors holding allowed general unsecured claims will receive distributions from a $200,000.00 fund, which the proponent of this Plan has valued at approximately 5 cents on the dollar. This Plan also provides for the payment of administrative and priority claims in full. Allowed administrative claims shall be paid by the Effective Date (as defined herein); allowed priority claims will be paid within one year of the Effective Date of the Plan.

All creditors and equity security holders should refer to Articles III through VI of this Plan for information regarding the precise treatment of their claim. A disclosure statement that provides more detailed information regarding this Plan and the rights of creditors and equity security holders has been circulated with this Plan. **Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

# ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

2.01    Class 1.    All allowed claims entitled to priority under § 507 of the Code (except administrative expense claims under § 507(a)(2), and priority tax claims under § 507(a)(8)).

2.02    Class 2(A).    The claim of CitiCapital Commercial Corp. to the extent allowed as a secured claim under § 506 of the Code.

       Class 2(B).    The claim of Doug Wood Holdings, LLC, to the extent allowed as a secured claim under § 506 of the Code.

       Class 2(C).    The claim of Doug Wood Holdings, LLC, to the extent allowed as a secured claim under § 506 of the Code.

       Class 2(D).    The claim of Great White Shark Enterprises, LLC. to the extent allowed as a secured claim under § 506 of the Code.

       Class 2(E).    The claim of Green Tulip Enterprises, Ltd., to the extent allowed as a secured claim under § 506 of the Code.

| | Class 2(F). | The claim of <u>Hansen Inc.</u>, to the extent allowed as a secured claim under § 506 of the Code. |
|---|---|---|
| | Class 2(G). | The claim of <u>Microsoft Capital Corp</u>, to the extent allowed as a secured claim under § 506 of the Code. |
| | Class 2(H). | The claim of <u>Tulip Group Investors, Ltd.</u>, to the extent allowed as a secured claim under § 506 of the Code. |
| | Class 2(I). | The claim of <u>Optimal IP Holdings, LP</u>, to the extent allowed as a secured claim under § 506 of the Code. |
| 2.03 | Class 3(A). | All unsecured claims allowed under § 502 of the Code, except those electing to be treated under the Administrative Convenience Class 3(B). |
| | Class 3(B). | The unsecured claims allowed under § 502 of the Code, electing to be treated under this section. |
| 2.04 | Class 4. | Equity interests of the Debtor. |

**ARTICLE III**
**TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, U.S. TRUSTEES FEES, AND PRIORITY TAX CLAIMS**

3.01    <u>Unclassified Claims</u>.  Under section §1123(a)(1), administrative expense claims, and priority tax claims are not in classes.

3.02    <u>Administrative Expense Claims</u>.  Each holder of an administrative expense claim allowed under § 503 of the Code will be paid in full on the effective date of this Plan (as defined in Article VII), in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor.

3.03    <u>Priority Tax Claims</u>.  Each holder of a priority tax claim will be paid in full over five years from the date of the order for relief in this case via even monthly payments.  (Interest rate purposefully omitted)

3.04    <u>United States Trustee Fees</u>.  All fees required to be paid by 28 U.S.C. §1930(a)(6) (U.S. Trustee Fees) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code.  Any U.S. Trustee Fees owed on or before the effective date of this Plan will be paid on the effective date.

## ARTICLE IV
## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

4.01    Claims and interests shall be treated as follows under this Plan:

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 - Priority Claims | Impaired | Class 1 is impaired by this Plan, and each holder of a Class 1 Priority Claim will be paid in full, in cash, without interest, via 12 even monthly payments, to be made on the or before the 10th day of each month following the effective date of this Plan as defined in Article VII, or the date on which such claim is allowed by a final non-appealable order which ever is later. |
| Class 2 –<br><br>Secured Claims | | |
| Class 2(A)<br>CitiCaptial Commercial Corp.<br>$2,583,251.79 | Impaired | The secured portion of this claim shall be paid pursuant to the terms of its agreements with the Debtor.  Any unsecured portion of this claim shall be treated as a Class 3 Claim.  This claim is secured by GPS Systems deployed at several golf courses and a cash hold back in the amount of approximately $800,000.00 that is in the possession of CitiCapital. |

| | | |
|---|---|---|
| Class 2(B)<br>Doug Wood<br>Holdings, LLC<br>$2,337,000.00 | Impaired | This claim is secured by a subordinated lien upon the majority of the assets of the Debtor. Due to the fact that the senior secured debt is substantially greater than the value of the collateral that secures this claim it shall be treated as a general unsecured claim under section 3(A) of the plan. |
| Class 2(C)<br>Doug Wood<br>Holdings, LLC<br>$750,000.00 | Impaired | This claim shall be converted to equity (1.52%) in the Reorganized Debtor. |
| Class 2(D)<br>Great White Shark<br>Enterprises, LLC<br>$3,500,000.00 | Impaired | This claim shall be converted to equity (7.48%) in the Reorganized Debtor. |
| Class 2(E)<br>Green Tulip<br>Enterprises, Ltd.<br>$400,000.00 | Impaired | This claim shall be converted to equity (.84 %) in the Reorganized Debtor. |

| | | |
|---|---|---|
| Class 2(F)<br>Hansen, Inc.<br>$1,500,000.00 | Impaired | This claim shall be converted to equity (3.04%) in the Reorganized Debtor. |
| Class 2(G)<br>Microsoft Capital Corp.<br>$6,041.00 | Unimpaired | This claim shall be paid according to contract terms and its lien rights shall not be modified by the plan. |
| Class 2(H)<br>Tulip Investments, Limited<br>$5,500,000.00 | Impaired | This claim shall be converted to equity (11.86%) in the Reorganized Debtor. This claim is secured by a blanket lien upon the assets of the Debtor. |
| Class 2(I)<br>Optimal IP Holdings LP<br>$1,794,227.05 | Impaired | The Debtor shall pay the allowed secured claim via even monthly payment over 5 years with 5% interest, beginning 60 days after the Effective Date. Any remaining unsecured portion of this claim shall be treated under Class 3(A). |
| Class 3(A) - General Unsecured Creditors | Impaired | Upon the effective date the Reorganized Debtor shall set aside the sum of $200,000.00 for the payment of these claims, and the holders of allowed unsecured claims shall receive a pro-rata distribution from this fund as soon as is practical under the circumstances. |
| Class 3(B)- General Unsecured Creditors Administrative Convenience Class | Impaired | The holder of any Class 3(A) claims may elect, to convert their claim to a Class 3(B) claim. These claims shall be paid the lesser of the actual amount of the claim and $500 in full satisfaction of the claim. This payment shall be made within 120 days from the Effective Date of the Plan. |
| Class 4 - Equity Security Holders of the Debtor | Impaired | All existing equity shall be cancelled pursuant to the terms of the Plan. |

## ARTICLE V
## ALLOWANCE AND DISALLOWANCE OF CLAIMS

5.01    Disputed Claim.  A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either: (i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

5.02    Delay of Distribution on a Disputed Claim.  No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.

5.03    Settlement of Disputed Claims.  The Debtor will have the power and authority to settle and compromise a disputed claim with Court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

## ARTICLE VI
## PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.01    Assumed Executory Contracts and Unexpired Leases.

(a)    The Debtor assumes the following executory contracts and/or unexpired leases effective upon the date of the order confirming this Plan:

1.    Club Car Inc. - Cooperation Agreement

2.    Global Golf Investors, LLC - Master Purchase Agreement (with Purchase Supplements)

3.    DC Leasing, LLC et al - Cooperation Agreement re Service and Advertising

4.    Travis Woods II, Ltd – Commercial Real Estate Lease

5.    MCR Properties, LLC - Commercial Real Estate Lease

6.    GolfView Investors, LLC - License Agreement

7.    Microsoft Great Plains License Agreement

8.    Shumaker Loop (SEC counsel) – Retainer Agreement

9.    Vision Perfect – License Agreement

10.     Epic Technologies, LLC – Manufacturing Agreement

11.     Product Design Technologies Incorporated - Mechanical Design Contract

12.     Phoenix Group - Services Agreement

13.     Cinterion Wireless Modules GmbH – Supply Agreement

14.     DC Leasing et al – License and Covenant Not to Sue Agreement

(b)    The Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases not expressly assumed under section 6.01(a) above, or before the date of the order confirming this Plan. A Proof of Claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than thirty (30) days after the date of the order confirming this Plan, or rejecting the contract/lease, whichever is earlier.

## ARTICLE VII
## MEANS FOR IMPLEMENTATION OF THE PLAN

The hearing on the approval of the Debtor's Disclosure Statement and Plan of Reorganization shall be combined, and the Debtor anticipates that the Plan will be confirmed by the end of September, 2009.

The Debtor's current cash-flow is negative and it will require approximately $1,000,000.00 to fund its shortfalls through confirmation. The Debtor has secured Debtor in Possession financing of up to $1,300,000.00 (the "DIP Financing") from Tulip Group Investments, Limited ("DIP Lender"), to permit it to meet its financial obligations through confirmation.

Pursuant to the terms of the DIP Financing and the Plan, DIP Lender shall receive 75.26% of the equity in the reorganized debtor and the holders of the first position blanket lien upon the majority of the assets of the Debtor (the "Secured Creditors") shall receive 24.74% of the equity of the reorganized debtor in full satisfaction of their respective secured claims. The reorganized debtor shall have until December 31, 2009 within which it may redeem the 75.26% stake in the reorganized debtor (the "Option Period") in exchange for payment of the outstanding balance due under the terms of the DIP Financing Agreement. If the option is not timely exercised, the DIP Financing shall be deemed paid in full upon the expiration of the Option Period. All existing equity in the debtor shall be cancelled.

Upon the effective date the reorganized debtor shall place the sum of $200,000.00 in to an escrow account to pay the allowed unsecured claims on a pro-rata basis. The Debtor shall pay

the holders of administrative convenience class claims from cash-flow and the DIP Financing. The Debtor has obtained an opinion as to the maximum value of the assets of the estate which concludes that they are worth no more than $3,100,000.00. The Secured Creditors are owed in excess of $11,000,000. Accordingly, in a liquidation of the Debtor, the unsecured creditors would receive nothing.

After confirmation of the Plan, the reorganized Debtor intends to enter into a business combination whereby it would receive the assets of a competitor in exchange for debt and equity. The potential parties to this transaction have executed a confidential, non-binding term sheet and are in the process of negotiating its details and completing due diligence. Payment of the unsecured creditors is not dependent upon the closing of this transaction.

## ARTICLE VIII
## GENERAL PROVISIONS

8.01    Definitions and Rules of Construction.  The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan.

8.02    Effective Date of Plan.  The effective date of this Plan, (the "Effective Date") is the eleventh business day following the date of the entry of the order of confirmation.  But if a stay of the confirmation order is in effect on that date, the effective date will be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

8.03    Severability.    If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

8.04    Binding Effect.    The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

8.05    Captions.  The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

8.06    Controlling Effect.    Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Florida govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

8.07    Corporate Governance.  The corporate charter of the Debtor shall be amended to prohibit the issuance of non-voting equity securities and to provide that the Debtor shall have

only one class of equity and the holders of such equity shall have voting power that is commensurate with their percentage ownership in the reorganized debtor.

## ARTICLE IX
## RETENTION OF JURISDICTION

9.01.  Notwithstanding the entry of the confirmation order and the occurrence of the effective date, until the reorganization case is closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of the reorganization case that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

## ARTICLE X
## DISCHARGE

10.01.  Except as otherwise expressly provided in this Plan or in the confirmation order, the confirmation order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the effective date of the Plan, of any and all debts of, and claims of any nature whatsoever against the Debtor that arose at any time prior to the confirmation date, including any and all claims for principal and interest, whether accrued before, on or after the Petition Date.

## ARTICLE XI
## OTHER PROVISIONS

11.01.  Plan Release.  In exchange for the DIP Financing and the release of the Secured Creditors' Claims, the Officers, Directors, Secured Creditors and DIP Lender shall receive a release of any and all claims that may arise from the filing of this case, the negotiation and the confirmation of this plan of reorganization.

11.02.  Exemption from Securities Laws.  Pursuant to 11 U.S.C. §1145, to the extent applicable, the transactions contemplated within this plan are exempt from state and federal Securities Laws.

**GPS Industries, Inc.**

By: /s/ David Chessler, CEO
David Chessler, Chief Executive Officer

# Exhibit B

**ASSETS**

| | | | Total | [See Text] MAXIMUM Fair Market Value | % Reduction |
|---|---|---|---|---|---|
| 11100 | | Operating Account | $ 51,860.29 | | |
| (11105 TO 11199) | | Other Accounts | $ 206,047.31 | | |
| | | Total Cash | $ 257,907.60 | $ 257,908 | -0- |
| 13??? | | Net Trade A/R | $ 780,575.96 | $ 468,346 | |
| (15110 TO 15190) | | Inventories | $ 4,545,009.03 | $ 1,363,503 | |
| (15210 TO 15230) | | Prepaid expenses | $ 291,729.87 | $ 100,000 | |
| | | Total Other Assets | $ 5,617,314.86 | $ 1,931,848 | 66% |
| | | Total Current Assets | $ 5,875,222.46 | $ 2,189,756 | 63% |
| (17110 TO 17190) | | G & A Assets | $ 2,784,441.34 | | |
| (17210 TO 17290) | | Less Accumulated Depreciation | $ ( 1,943,605.87 ) | | |
| | | | $ 840,835.47 | $ 300,000 | 64% |
| 17500 | | Course Assets | $ 1,498,559.86 | | |
| 17600 | | Less Accumulated Depreciation | $ ( 1,446,895.82 ) | | |
| | | | $ 51,664.04 | $ 40,000 | 23% |
| (19210 TO 19220) | | Third party leases with recourse | $ 691,559.99 | | |
| (19291 TO 19292) | | Less Accumulated Amortization | $ ( 240,962.22 ) | | |
| | | | $ 450,597.77 | $ 350,000 | 22% |
| | | Net Fixed Assets | $ 1,343,097.28 | $ 690,000 | 49% |
| 19100 | | Long-Term Receivable | $ 108,000.00 | $ 100,000 | 7% |
| (19300 TO 19340).. | | Patents/Designs, net | $ 4,420,505.40 | | |
| 19390 | | Less Accumulated Amortization | $ ( 1,814,521.15 ) | | |
| | | | $ 2,605,984.25 | $ 50,000 | 98% |
| 19410 | | Deferred Development Costs | $ 139,204.01 | $ - | 100% |
| (19510 TO 19690) | | Deposits | $ 859,880.36 | $ 10,000 | 99% |
| (19700 TO 19703) | | Investment In | $ - | | |
| | | Net Other Assets | $ 3,713,068.62 | $ 160,000 | 96% |
| | | Total Assets | $ 10,931,388.36 | $ 3,039,756 | 72% |

# Exhibit C

# GPS INDUSTRIES, INC.

## FORM 10-Q
(Quarterly Report)

Filed 05/18/09 for the Period Ending 03/31/09

| | |
|---|---|
| Telephone | 6045767442 |
| CIK | 0000029233 |
| Symbol | GPSNQ |
| SIC Code | 3669 - Communications Equipment, Not Elsewhere Classified |
| Industry | Business Services |
| Sector | Services |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2009**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD** From _____ to_____

Commission file number 000-30104

# GPS INDUSTRIES, INC.

(Exact name of registrant as specified in its charter)

| Nevada | 88-0350120 |
|---|---|
| (State or other jurisdiction of incorporated or organization) | (I.R.S. Employer Identification No.) |

1358 Fruitville Road, Suite 210, Sarasota, Florida 34236

(Address of principal executive offices)          (Zip Code)

(941) 364-8180

(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities and Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒          No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§229.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

Yes ☐          No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐          Accelerated Filer ☐          Smaller reporting company ☒
Non-accelerated Filer (Do not check if a smaller reporting company) ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

☐ Yes          ☒ No

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding at May 11, 2009 |
|---|---|
| Class A common stock, $.001 par value | 590,832,986 shares |

# GPS INDUSTRIES, INC.

| Index | | | Page |
|---|---|---|---|
| **Part I.  Financial Information** | | | |
| | Item 1. | Financial Statements (unaudited) | |
| | | Condensed Consolidated Balance Sheets – March 31, 2009 (unaudited) and December 31, 2008 | 4 |
| | | Condensed Consolidated Statements of Operations – Three-months ended March 31, 2009 and 2008 (unaudited) | 5 |
| | | Condensed Consolidated Statements of Cash Flows – Three-months ended March 31, 2009 and 2008 (unaudited) | 6 |
| | | Notes to Unaudited Condensed Consolidated Financial Statements | 7 |
| | Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 10 |
| | Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 12 |
| | Item 4.T | Controls and Procedures | 12 |
| **Part II.  Other Information** | | | |
| | Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 14 |
| | Item 5. | Other Information | 14 |
| | Item 6. | Exhibits | 14 |
| **Signatures** | | | 15 |

**Introduct ory Note: Caution Concerning Forward-Looking Statements**

This Report and our other communications and statements may contain "forward-looking statements," including statements about our beliefs, plans, objectives, goals, expectations, estimates, projections and intentions. The words "may," "could," "should," "would," "believe," "anticipate," "estimate," "expect," "intend," "plan," "target," "goal," and similar expressions are intended to identify forward-looking statements. All forward-looking statements, by their nature, are subject to risks and uncertainties and are also subject to change based on various factors, many of which are beyond our control. Our actual future results may differ materially from those set forth in our forward-looking statements. For information concerning these factors and related matters, see Item 2, "Management's Discussion and Analysis of Financial Condition and Results of Operations," in this Report, and the following sections of our Annual Report on Form 10-K for the year ended December 31, 2008: (a) "Risk Factors" in Part I, Item 1A and (b) "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7. However, other factors besides those referenced could adversely affect our results, and you should not consider any such list of factors to be a complete set of all potential risks or uncertainties. Any forward-looking statements made by us herein speak as of the date of this Report. We do not undertake to update any forward-looking statement, except as required by law.

Unless the context otherwise indicates, all references in this report to the "Company," "GPSI," "we," "us," or "our," or similar words are to GPS Industries, Inc. and its subsidiaries.

**Part I. Financial Information**

**Item I. Financial Statements Condensed**

GPS INDUSTRIES INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED BALANCE SHEETS

| ASSETS | | March 31, 2009 (Unaudited) | | December 31, 2008 |
|---|---|---|---|---|
| | | (In thousands, expect per share amounts) | | |
| Current Assets: | | | | |
| Cash | $ | 1,278 | $ | 1,823 |
| Accounts receivable, net | | 537 | | 692 |
| Inventories, net | | 4,738 | | 4,311 |
| Prepaid expenses and other current assets | | 271 | | 312 |
| Total current assets | | 6,824 | | 7,138 |
| Property and equipment, net | | 943 | | 978 |
| Third party leases with recourse, net | | 461 | | 492 |
| Intangible assets, principally patents | | 2,669 | | 2,831 |
| Other assets, including deposits of $847 and $862 in 2009 and 2008 | | 1,109 | | 1,131 |
| Total assets | $ | 12,006 | $ | 12,570 |
| LIABILITIES AND SHAREHOLDERS' DEFICIT | | | | |
| Current Liabilities: | | | | |
| Notes payable | $ | 1,300 | $ | 1,352 |
| Current maturities of long-term debt | | 3,315 | | 6,818 |
| Customer deposits | | 5,907 | | 3,534 |
| Accounts payable | | 5,659 | | 5,522 |
| Accrued liabilities | | 7,829 | | 8,315 |
| Total current liabilities | | 24,010 | | 25,541 |
| Long-term debt, net of current maturities | | 11,258 | | 7,405 |
| Other accrued liabilities, net of current maturities | | 1,781 | | 1,830 |
| Total liabilities | | 37,049 | | 34,776 |
| SHAREHOLDERS' DEFICIT | | | | |
| Series B convertible preferred stock, $10 par value, 4,000,000 authorized, 3,244,089 issued and outstanding | | 32,441 | | 32,441 |
| Class A common stock, $.001 par value, 1,600,000,000 authorized 563,499,653 and 542,499,653 issued and outstanding, respectively | | 563 | | 543 |
| Accumulated other comprehensive income | | 722 | | 722 |
| Additional paid-in capital | | 77,873 | | 77,896 |
| Accumulated deficit | | (136,642) | | (133,808) |
| Total shareholders deficit | | (25,043) | | (22,206) |
| | $ | 12,006 | $ | 12,570 |

See accompanying notes to these condensed consolidated financial statements

# GPS INDUSTRIES INC. AND SUBSIDIARIES
## CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS

|  | For the Three Months Ended March 31, | |
|  | 2009 | 2008 |
|---|---|---|
|  | (In thousands, expect per share amounts, unaudited) | |
| Revenue | $ 888 | $ 2,267 |
| Cost of goods sold | 1,325 | 2,025 |
| Gross profit (loss) | (437) | 242 |
| Selling, general and administrative expenses | 1,573 | 2,155 |
| Engineering and research and development | 401 | 477 |
| Depreciation and amortization | 259 | 553 |
|  | 2,233 | 3,185 |
|  | (2,670) | (2,943) |
| Other Income (Expense): |  |  |
|   Interest expense and finance costs | (426) | (266) |
|   Gain on foreign exchange | 226 | 241 |
|   Gain on settlement of liabilities | 31 | 18 |
|   Other Income | 6 | - |
|  | (163) | (7) |
| Net loss | $ (2,833) | $ (2,950) |
| Loss per common share |  |  |
| - Basic and diluted | $ (0.01) | $ (0.01) |
| Weighted average number of common shares outstanding |  |  |
| - Basic and diluted | 553,088,542 | 525,809,414 |

See accompanying notes to these condensed consolidated financial statements

GPS INDUSTRIES INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | 2009 | 2008 |
| | (In thousands, unaudited) | |
| Cash Flow From Operating Activities | | |
| Net Loss | $ (2,833) | $ (2,950) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 91 | 163 |
| Provision for doubtful accounts | 67 | - |
| Amortization of convertible debt discount | 83 | - |
| Amortization of intangibles | 190 | 605 |
| Amortization of third party lessor recourse guarantees, net | 31 | 31 |
| Issuance of stock for services | 79 | - |
| Gain on settlement of liabilities | (31) | (18) |
| Other | (123) | (525) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 88 | 145 |
| Inventories | (427) | (882) |
| Prepaid expenses and other assets | 35 | 58 |
| Customer deposits | 2,374 | 410 |
| Accounts payable and accrued liabilities | 280 | 1,133 |
| Other accrued liabilities | (338) | (315) |
| Net Cash Used in Operating Activities | (434) | (2,145) |
| Cash Flow From Investing Activities | | |
| Purchase of property and equipment | (56) | (60) |
| Cost of acquisition of subsidiaries, net of cash acquired | - | (1,658) |
| Net Cash Flow Used In Investing Activities | (56) | (1,718) |
| Cash Flow From Financing Activities | | |
| Proceeds from loans | 3,500 | 1,800 |
| Repayments on loans and bank indebtedness | (3,555) | 1,424 |
| Net Cash Flow Provided By (Used In) Financing Activities | (55) | 3,224 |
| | | |
| Net Decrease In Cash | (545) | (639) |
| | | |
| Cash, Beginning of Period | 1,823 | 1,488 |
| Cash, End of Period | $ 1,278 | $ 849 |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Cash paid for interest | $ 79 | $ 253 |
| Non-Cash Investing And Financing Activities: | | |
| Common stock issued to settle liabilities | $ 53 | $ - |
| Common stock issued for investments | $ - | $ 8,034 |
| Preferred stock issued for investment | $ - | $ 1,200 |
| Note payable issued for accrued interest | $ 270 | $ - |

See accompanying notes to these condensed consolidated financial statements

6

# GPS INDUSTRIES, INC.
## Notes to Condensed Consolidated Financial Statements
*All amounts in thousands, except per share amounts*

**Note 1 – Basis of Presentation**

The accompanying condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements.

The financial statements have been prepared assuming that the Company will continue as a going concern. The Company's ability to continue as a going concern is subject to substantial doubt due to the Company's history of losses, limited financial resources and need for additional working capital to implement the Company's business plan. At March 31, 2009 the Company has a working capital deficit. The Company requires additional funding in order to repay its debt and to market and distribute its products, exploit the technology underlying its patents, further develop existing and new products, and pay its other existing current liabilities.

In the opinion of management, all material adjustments (consisting of normal recurring adjustments) considered necessary for a fair presentation have been included. Operating results for the three months ended March 31, 2009 are not necessarily indicative of the results that may be expected for the full year ending December 31, 2009.

The condensed consolidated balance sheet at December 31, 2008 has been derived from the audited consolidated financial statements at that date but does not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. Certain reclassifications were made to the 2008 amounts to conform to the 2009 presentation including a reclassification of certain Uplink amortization from gross margin to selling, general and administrative expenses. The impact of this reclassification is as follows:

| | March 31, 2008 | | |
|---|---|---|---|
| | As Reported | Reclassification | As Restated |
| Revenue | $ 2,666 | $ 399 | $ 2,267 |
| Cost of Goods Sold | 2,270 | 245 | 2,025 |
| Gross profit (loss) | 396 | 154 | 242 |
| Operating and other expenses | 3,346 | (154) | 3,192 |
| Net Loss | $ (2,950) | $ - | $ (2,950) |

For further information, refer to the consolidated financial statements and footnotes thereto included in the GPS Industries, Inc. Annual Report on Form 10-K for the year ended December 31, 2008.

Note 2 – Inventory, Net

Inventory consists of the following:

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| | ($000 omitted) | |
| Inventory Components | $ 4,172 | $ 3,993 |
| Completed Units | 817 | 1,111 |
| Deferred Installation Costs | 2,093 | 1,551 |
| | 7,082 | 6,655 |
| Less: Inventory Reserve | (2,344) | (2,344) |
| | $ 4,738 | $ 4,311 |

**Note 3 – Accrued Liabilities**

Accrued liabilities consist of the following:

| | March 31, 2009 | | December 31, 2008 | |
|---|---|---|---|---|
| | ($000 omitted) | | | |
| Accrued restructuring costs | $ | 1,238 | $ | 1,450 |
| Accrued liability - Optimal acquisition | | 1,160 | | 1,307 |
| Accrued interest | | 1,144 | | 887 |
| Accrued professional fees | | 448 | | 669 |
| Deferred revenue | | 1,455 | | 1,597 |
| Inventory in transit | | 661 | | 661 |
| Accrued payroll related | | 513 | | 521 |
| Accrued warranty costs | | 364 | | 430 |
| Accrued other | | 846 | | 793 |
| Total accrued liabilities | $ | 7,829 | $ | 8,315 |

**Note 4 – Other Accrued Liabilities**

Other accrued liabilities consist of the following:

| | March 31, 2009 | | December 31, 2008 | |
|---|---|---|---|---|
| | ($000 omitted) | | | |
| Estimated recourse liability | $ | 1,334 | $ | 1,428 |
| Third-party lease rental agreements | | 696 | | 747 |
| Other deferred revenue | | 964 | | 855 |
| Total Other Accrued Liabilities | | 2,994 | | 3,030 |
| Less:  Current portion | | (1,213) | | (1,200) |
| Total Long-term Other Accrued Liabilities | $ | 1,781 | $ | 1,830 |

**Note 5 - Notes Payable and Long-Term Debt**

**Notes Payable** – Notes payable consists of the following:

| | March 31, 2009 | | December 31, 2008 | |
|---|---|---|---|---|
| | ($000 omitted) | | | |
| 12.0% to 18.0% Term notes, payable on demand | $ | 1,244 | $ | 1,244 |
| Bank overdraft credit facility, due on demand, interest only payments at 3.75% over the bank's base rate (7% at December 31, 2008), collateralized by a debenture comprising fixed and floating charges over all the assets and undertakings of GPSI Europe | | 56 | | 108 |
| | $ | 1,300 | $ | 1,352 |

**Long – Term Debt** – Long term debt consists of the following:

| | March 31, 2009 | December 31, 2008 |
|---|---|---|
| | ($000 omitted) | |
| 6% Revolving Line of Credit, retired in April 2009 | $ 3,000 | $ 6,500 |
| 7% Promissory Note to related party, principal and interest due in June 2011 | 3,500 | - |
| 7% Non-negotiable Convertible Promissory Note to related party, convertible to Series C Preferred stock, principal and interest due in June 2011, net of unamortized discount of $748,000 and $832,000 in 2009 and 2008 respectively. | 4,752 | 4,668 |
| 7% Promissory Note to related party, principal and interest due in June 2011 | 2,337 | 2,337 |
| 7% Other Secured Promissory Note to related party, due November 2011, convertible to Series C Preferred Stock | 400 | 400 |
| 7% Note Payable to related party, payable in four equal quarterly installments through September 30, 2009 | 100 | 100 |
| Other notes payable maturing through September 2009 with monthly principal and interest payments of $1,287 | 7 | 11 |
| 8% Fleet Rental Notes maturing through September 2011, with monthly principal payment ranging from $1,367 to $6,872 over the period | 207 | 207 |
| 7% Note Payable due December 2010 | 270 | - |
| Total Long-term debt | 14,573 | 14,223 |
| Less: Current portion | (3,315) | (6,818) |
| Long-term debt, net of current maturities | $ 11,258 | $ 7,405 |

## Note 6- Common Stock

In February 2009, the Company issued 21,000,000 shares of its Class A common stock, at an aggregate value of $298,000, in settlement of certain obligations.

During April, 2009, the Company issued 27,333,333 shares of common stock and a warrant to purchase up to 6,833,333 shares of the Company's common stock at $0.122 per share in exchange for forgiveness of the $820,000 owed to Leisurecorp, LLC. This amount had previously been included in current liabilities in the Company's consolidated balance sheets at March 31, 2009 and December 31, 2008. The Company expects to record a gain on extinguishment of debt of approximately $400,000.

## Note 7- Net Loss per Share

The additional shares arising from the exercise of the stock option and warrant or the conversion of preferred stock have been excluded from the computation of diluted net loss per share because their inclusion would be anti-dilutive.

**Note 8- Restructuring Costs**

In 2007 the Company recorded $1,091,000 in restructuring charges for accrued severance benefits resulting from the downsizing of current operations, and an acquisition the Company rescinded in 2007.

During 2008 the Company recorded an accrual of $1,476,000 in restructuring charges which consisted principally of severance benefits resulting from the plan to downsize and realign the ongoing operations adopted by the new management team in 2008.

No additional expenses were charged to these accruals during the three months ended March 31, 2008 and 2009. The Company paid $237,000 and $212,000 respectively, of these costs during the three months ending March 31, 2008 and 2009.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

**Management's Discussion and Analysis of Results of Operations**

**Three-months ended March 31, 2009 compared to March 31, 2008**

For the three-months ended March 31, 2009, we recorded total revenue of $888,000 compared to $2,267,000 during the same period in 2008. This $1,379,000 decrease was due to a decrease in 18-hole equivalent sales at lower average selling price per 18-hole equivalents. This decrease in 18-hole equivalent sales was due to certain technical issues with the new Informer HDmax unit which were resolved early in the second quarter. The vast majority of contracted new installations for 2009 are for the Informer HDmax, therefore revenues from new system sales were significantly diminished.

Cost of goods sold in 2009 is lower than 2008 due to the decrease in new system sales. Negative gross margin in 2009 is the result of the gross margin generated by the low sales volume being insufficient to cover the fixed cost.

Selling, general and administrative expenses decreased by $582,000 in 2009 to $1,573,000 from $2,155,000 in 2008. The decrease was primarily a result of the reduction of payroll of $371,000, tradeshows of $139,000, rent of $67,000, and legal of $48,000 offset by higher consulting expenses of $160,000. The reduction in payroll is attributed to the consolidation of efforts and attrition from moving corporate headquarters to Sarasota, FL from Vancouver, BC. In 2009, the Company's decision to reduce the participation level in tradeshows resulted in significant savings. During 2008, the company vacated two of the previously occupied offices and relocated to less expensive locations in both Austin, TX and Vancouver, BC. The increase in consulting fees in 2009 is primarily from an agreement between the Company and GPSI Asia during the second half of 2008, in which the Company pays GPSI Asia $20,000 per month, $60,000 for the quarter. Additionally, an agreement was completed for consulting services, which the Company paid with stock, valued at $65,000 at the time of issuance.

Engineering and research and development expenses for the three-months ending March 31, 2009 decreased by $76,000. The savings are primarily due to reductions in staff, resulting in $250,000 decrease in payroll expenses during the first three months of 2009 compared to the first three months of 2008. Related expenses of travel, communications, and general office also decreased by $65,000. These savings were offset by the reduction of cost recovery recognized by the Company as a result of its arrangement with Club Car. The Company had entered into an arrangement with Club Car to develop the Guardian product utilizing IQ Link technology. The agreement provides for the Company to recover $750,000 of development costs during the development phase. For the three months ended March 31, 2008, the Company had recorded $337,000 in recovery, and for the three months ended March 31, 2009, the Company recorded $112,000 in recovery. The resulting decrease of $225,000 in recovery reduced the impact of the savings from staff reductions. The final $25,000 in cost recovery will be recognized in April 2009.

Depreciation and amortization expense is primarily due to the amortization of the Company's acquired patents, as well as the depreciation of the Company's property and equipment. Depreciation and amortization decreased from $553,000 to $259,000. The decrease is a result of the final valuation and subsequent impairment assigned to the assets acquired as part of the Uplink and GPSI Europe transactions including certain patents, fixed assets and goodwill. All patents are being amortized over the remaining life of the patents.

In December 2008, the Company's senior management committed to a restructuring plan involving the downsizing of the Company's operations. This plan included a process to terminate employees and reduce office rents. This restructure plan was begun in January 2009. For the three months ended March 31, 2009, the Company utilized $212,000 of the $1,368,000 planned restructure accrual.

The Company's loss before other income (expense) decreased by $273,000; from $2,943,000 in 2008 to $2,670,000 in 2009. The decrease in loss before other income (expense) for 2009 was largely due to efforts to consolidate and reorganize the Company after the acquisition of Uplink in January 2008.

During the period ended March 31, 2009, the company incurred a foreign currency exchange gain of $226,000 compared to a gain of $241,000 in 2008.

Interest expense and finance costs increased from $266,000 in the first three months of 2008 to $426,000 in 2009. These costs increased primarily due to the increase in the Company's notes payable, including the $5,500,000 borrowing under a Convertible Promissory Note issued in June 2008 and the $3,500,000 Promissory Note issued in January 2009.

The Company recorded a gain on extinguishment of debt of $31,000 for the three month period ended March 31, 2009 versus a gain of $18,000 in the same period in 2008.

As a result of the above, net loss was $2,833,000 for the three month period ended March 31, 2009 compared to $2,950,000 for the same period in 2008.

**Liquidity and Capital Resources**

We have incurred losses since our inception and expect to continue to incur losses in the near future. Our auditors have issued a going concern opinion as a result of the Company's inability to generate sufficient cash from operations to meet our current obligations. We need a substantial amount of new funding to meet our cash requirements, including the repayment of debt, for the next 12 months and to fully implement our business plan .We currently are evaluating alternate sources and types of financing. GPSI has undertaken a restructuring of our operations to increase sales and reduce expenses, with the goal of reducing and eventually eliminating our operating losses. However, there can be no assurance that we will be successful in these efforts or that we will be able to continue as a going concern.

At March 31, 2009 the Company had cash and cash equivalents of $1,278,000 as compared to $1,823,000 as of December 31, 2008.

Net cash used by operating activities for the three month period ended March 31, 2009 was $119,000, as compared to $1,528,000 during the three month ended March 31, 2008. Net cash used in investing activities was $357,000 in the first three months of 2009 as compared to $814,000 in the same period in 2008. Net cash used by financing activities was $69,000 for the first quarter of 2009, as compared to net cash provided of $1,703,000 for the same quarter of 2008.

As of March 31, 2009 the Company had a working capital deficiency of $17,186,000 compared to $18,403,000 as of December 31, 2008.

Our ability to repay our accounts payable and other outstanding indebtedness, and our ability to maintain sufficient liquidity to continue our operations, is significantly dependent upon our ability to generate sufficient cash from sales in 2009 and beyond, supplemented by the Company's ability to attract additional investment. The Company is continuing to work with its existing investors to obtain further debt or equity funding that will provide longer-term liquidity although no assurance can be given that such funds will be available or, if available what the terms might be.

**Critical Accounting Policies, Estimates and Assumptions**

We believe the following discussion addresses our most critical accounting policies, which are those that are most important to the portrayal of our financial condition and results of operations and require management's most difficult, subjective, or complex judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. Accounting policies, in addition to the critical accounting policies referenced below, are presented in Note 2 to our consolidated financial statement included in our Annual Report on form 10-K for the year ended December 31, 2008, "Summary of Significant Accounting Policies."

**Use of Estimates**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Revenue Recognition**

The Company recognizes revenue only when persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable, and collectability is probable. When other significant obligations remain after products are delivered, associated revenue is recognized only after such obligations are fulfilled.

System sales are derived from the sales of the Company's product lines directly to end-user customers and third-party equipment lessors. Recurring revenues consist of (i) transactions which are recognized ratably over the end-user contract term from equipment sales to third parties that have a recourse component to the Company , (ii) revenues realized from the rental of Company owned equipment through either fixed rental payments or actual usage (iii) advertising revenues and (iv) service revenues. The Company recognizes revenue on certain contracts based on completion of major project milestones.  These project contracts are with a related party.

Rental income arises from the leasing of the Company's golf equipment to customers. Lease terms are generally 60 months and are operating leases. Depreciation expense for assets subject to these operating leases is provided primarily on the straight-line method over the term of the lease in amounts necessary to reduce the carrying amount to its estimated residual value.

For certain long-term equipment lease contracts, the Company utilizes third-party financing entities to which the Company sells the equipment for a purchase price. The Company evaluates the rights of the financing entity in these transactions to determine the proper revenue recognition treatment.  For instances where the Company has guaranteed the lease rental payments in the event of customer default, revenue and product cost is deferred and is recognized ratably over the contract term.

**Item 3. Quantitative and Qualitative Disclosures about Market Risk**

The Company's operations are principally located in the United States and Canada and, to a lesser extent,  the United Kingdom. The Company is subject to business risks inherent in non-U.S. activities, including political and economic uncertainty, import and export limitations, and market risk related to changes in interest rates and foreign currency exchange rates. The Company's principal currency exposure against the U.S. dollar is the Canadian dollar.

The Company had no holdings of derivative financial or commodity interest at March 31, 2009.  Substantially all of the Company's borrowings at March 31, 2009 bear interest at fixed rates.

**Item 4T. Controls and Procedures**

**Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports that we file with the SEC under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including our principal executive and financial officers, as appropriate, to allow for timely decisions regarding required disclosure. Disclosure control procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and Management is required to apply its judgment in evaluating the cost-benefit relationship of controls and procedures.

**Management's Report on Internal Control Over Financial Reporting**

The Company's management's is responsible for establishing and maintaining adequate internal control over financial reporting for the registrant. The Company's management, including the Principal Executive Officer and the Chief Financial Officer, carried out an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a - 15(b). Based upon the evaluation, the Principal Executive Officer and the Chief Financial Officer concluded that the Company's internal controls are not effective and contain significant deficiencies, in part as a result of the material weakness discussed below.

The report entitled Internal Control - Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) defines a material weakness as a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

The Company's annual report for the year ended December 31, 2008 did not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit the company to provide only management's report in this annual report.

**Management's Discussion of Material Weakness**

Management has identified the following groups of control deficiencies, each of which, in the aggregate, represents a material weakness in the Company's internal control over financial reporting as of March 31, 2009:

- The Company has engaged in a number of related-party transactions. Additionally, certain of the Company's executive, directors and shareholders have outside business interest that could conflict with the priorities of the Company.
- The Company has not widely circulated a code of ethics beyond the Company's directors and officers, including the Company's whistle blower policy.
- The Company did not design and implement controls to communicate and monitor corporate strategy and objectives or compliance with policies and procedures, including expenditure policies at its operation in the United Kingdom.
- The Company has no independent directors on the Board of Directors.
- There has been a temporary degradation of controls, which may or may not have reached the level of a material weakness, resulting from the departure of certain key personnel arising from the integration of the Uplink acquisition into GPS Industries.

Management of the Company takes very seriously the strength and reliability of the of the internal control environment for the Company. During 2008 and continuing in 2009, the Company has undertaken steps necessary to improve the control environment that include:

- The Company implemented a new accounting system to more effectively manage expenditures and analyze results against budgets and plans.
- Engaged Deloitte Touche, LLP to assist in the assessment, development and implementation of internal controls and business process documentation. The Company has started to develop a top-down, risk-based approach to SOX compliance that focuses on key controls and high-risk areas. This effort was suspended during the third quarter of 2008 as the Company focused on the integration of Uplink into the GPS Industries organization.
- The Company has hired a permanent Chief Executive Officer.
- The Company reconstituted and enhanced the Board of Directors with the appointment of Tony Sole, CFO of Leisurecorp, Declan Hogan, Senior IT Manager, Leisurecorp, and David Chessler, CEO of GPS Industries.

Management acknowledges its responsibility for internal controls over financial reporting and seeks to continually improve these controls. In order to achieve compliance with Section 404 of the Sarbanes Oxley Act, we are performing system and process documentation and evaluation needed to comply with Section 404, which is both costly and challenging. We believe our process for documenting, evaluating and monitoring our internal control over financial reporting is consistent with the objectives of Section 404 of the Act.

**Changes in Internal Controls**

The Company has continued to take remediation steps to enhance its internal control over financial reporting and reduce control deficiencies. Since mid - 2008, the remediation efforts were slowed as a result of trying to integrate the operations of the Uplink acquisition and to streamline the resulting organization. We will continue to work on the elimination of control weaknesses and deficiencies noted.

**Part II. Other Information**

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

During the three months ended March 31, 2009, the Company issued the following unregistered securities:

- On February 12, 2009, the Company issued 3,000,000 shares valued at $38,700 for settlement of trade payables.
- On February 12, 2009, the Company issued 5,000,000 shares valued at $64,500 for services rendered.
- On February 13, 2009, the Company issued 12,000,000 shares valued at $180,000 as further payment against the liability for the 2004 purchase of Optimal Golf Solutions, Inc.
- On February 16, 2009, the Company issued 1,000,000 shares valued at $15,000 in settlement of a separation agreement.

**Item 5. Other Information**

In April 2009, the Company entered into a Master Purchase Agreement with GPS Golf Investors LLC (GGI), a limited liability company owned or controlled by the Company's Vice President of Sales and Chief Executive Officer pursuant to which the Company has the right to request that GGI purchase equipment of the Company relating to GPS devices for use on golf courses. Any purchase will be pursuant to a purchase supplement, which will cover the terms and conditions of any purchase. GGI will lease the purchased equipment to golf courses. The Purchase Agreement provides, among other things, that GGI will receive all equipment lease receipts until their investment in purchased equipment is recovered; after which subsequent equipment lease receipts are split with the Company equally. The Purchase Agreement also provides for a maintenance agreement between the Company and the prospective lessee.

**Item 6. Exhibits**

(a)     Exhibits

| | |
|---|---|
| 10.27 | Master Purchase Agreement, dated April 08, 2009, between GPS Golf Investors LLC and GPS Industries, Inc. |
| 10.28 | Warrant, dated April 23, 2009, Leisurecorp, LLC |
| 31.1 | Certification of Chief Executive Officer Pursuant to Rule 13a – 14(a) of the Securities Exchange Act of 1934, as amended |
| 31.2 | Certification of Chief Financial Officer Pursuant to Rule 13a – 14(a) of the Securities Exchange Act of 1934, as amended |
| 32 | Certifications of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U. S. C. Section 1350. |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned thereunto duly authorized.

|  | GPS INDUSTRIES, INC. |
| --- | --- |
| May 15, 2009 | By: /s/ David Chessler |
|  | David Chessler, Chief Executive Officer (Principal Executive Officer) |
| May 15, 2009 | By: /s/ Russell R. Lee  III |
|  | Russell R. Lee, Chief Financial Officer (Principal Financial and Accounting Officer) |

Exhibit 10.27

## MASTER PURCHASE AGREEMENT

THIS MASTER PURCHASE AGREEMENT (this "Agreement")  is made and entered on 8 April 2009, by and between GPS Golf Investors LLC, a Florida limited liability company ("Purchaser"), and GPS Industries, Inc., a Nevada corporation ("Seller").

### R E C I T A L S

A.        Seller has requested that Purchaser purchase Equipment from Seller pursuant to this Agreement and lease the Equipment to Customers pursuant to an Equipment Lease.

B.        Purchaser has agreed to purchase the Equipment from Seller pursuant to this Agreement and lease the Equipment to Customers pursuant to an Equipment Lease, subject to the terms and conditions set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**1.  Defined Terms.**

Capitalized terms not defined elsewhere in this Agreement shall have the meaning set forth in <u>Schedule 1</u> of this Agreement.

**2.  Purchase of Equipment.**

(a)        Seller hereby agrees to convey, sell, and deliver to Purchaser, and Purchaser hereby agrees to purchase and accept from Seller, upon the terms and conditions set forth in this Agreement, the Equipment described on each Purchase Supplement that shall be executed and delivered by Seller and Purchaser.  Each Purchase Supplement will be entered into pursuant to and conditioned upon the terms set forth in <u>Schedule 2</u> of this Agreement or such other terms as are agreed upon in writing by Seller and Purchaser.

**(b)**        This Agreement contains general terms and conditions that shall apply to each Purchase Supplement. Each Purchase Supplement will contain terms and conditions applying only to the Item of Equipment covered by that Purchase Supplement. Each Purchase Supplement shall be subject to all of the terms and conditions set forth in this Agreement.  If there is any conflict between the terms of this Agreement and the terms of a Purchase Supplement, the terms of this Agreement shall control.  Each Purchase Supplement shall constitute a separate purchase of the Item of Equipment subject thereto and shall be separately enforceable.

**3.  Payment Terms.**

Purchaser shall pay Seller for each Item of Equipment in the amounts and on the dates specified in the related Purchase Supplement.  The parties acknowledge and agree that the purchase price ("Purchase Price") shall be the Seller's cost of goods for the hardware components of the Equipment and such Purchase Price shall be paid directly to Seller's vendors.

**4. Seller's Warranties.**

   (a)     Equipment . Seller has good and marketable title to, and is the owner of, the Equipment, free and clear of all of all liens, mortgages, security interests, leases, options, pledges, charges, covenants, conditions, restrictions and other encumbrances and claims of any kind or character whatsoever (collectively, "Encumbrances") (other than those Encumbrances which shall be released upon sale and delivery of each Item of Equipment to Purchaser).  Upon execution of each Purchase Supplement, Purchaser will have good and marketable title to the Item of Equipment referred to in such Purchase Supplement, free and clear of all Encumbrances.  The manufacture and sale of the Equipment by Seller, and the use and lease of the Equipment by Purchaser does not violate, infringe, misappropriate or misuse any intellectual property rights or trade secrets of any person.

   (b)     No Fraudulent Transfer .  The transactions contemplated by this Agreement are not fraudulent to any of Seller's creditors, whether or not the creditor's claims arose before or after the execution of a Purchase Supplement or the occurrence of any such transaction.  This Agreement is not being executed: (a) with actual intent to hinder, delay, or defraud any of Seller's creditors; or (b) without receiving a reasonably equivalent value in exchange for the consideration provided by Seller under this Agreement.

**5. Maintenance of Equipment; Warranties; Event of Loss.**

   (a)     Concurrently with the purchase of each Item of Equipment by Purchaser, Seller shall enter into a maintenance agreement (the "Maintenance Agreement") with each Customer in which Seller agrees to properly service and maintain the Item of Equipment.  Purchaser will collect all such service fees for the term of the Equipment Lease and any extensions thereto and will forward the service fees to Seller as provided herein and in the Purchase Supplements and further will provide in each Equipment Lease that the failure of the lessee to pay all fees owed under the Maintenance Agreement will constitute a default under the Equipment Lease.

   (b)     Notwithstanding anything to the contrary contained in Section 5(b) , Seller agrees that regardless of terms of such Maintenance Agreement or the payment by prospective lessee of its payment obligations thereunder, Seller shall be responsible for all costs, expenses and obligations of every kind and nature incurred in connection with the use or operation of the Equipment which may arise or be payable during the life of the Equipment hereunder, whether or not such cost, expense or obligation is specifically referred to herein, provided that in the event the lessee fails to pay any fees owed under the Maintenance Agreement, Purchaser takes commercially reasonable efforts to exercise its remedies thereunder. Seller at all times shall maintain, service and repair any damage to the Equipment so as to keep the Equipment in good and efficient working order, condition and repair, ordinary and reasonable wear and tear resulting from proper use excepted, and make all inspections and repairs, including replacement of worn parts, to effect the foregoing and to comply with requirements of laws, regulations, rules and provisions and conditions of insurance policies.  All replacements, repairs, improvements, alterations, substitutions and additions shall constitute accessions to the Equipment and title thereto shall vest in Purchaser, and shall be free of any and all liens.  In performing its obligations under this Section, Seller will not treat the Equipment less favorably than similar equipment that it owns or leases.

(c)     Seller assumes all risk of and shall indemnify and hold harmless Purchaser from and against all damage to and loss of the Equipment arising out of any action or omission in connection with the performance of its services under any Maintenance Agreement, whether or not such loss or damage is or could have been covered by insurance (an "Event of Loss"). Each party shall promptly give the other party written notice of any material loss or damage, describing completely and in detail the cause and the extent of loss and damage. Upon the occurrence of an Event of Loss, at its option, Seller shall: (i) repair or restore the damaged or lost Items of Equipment to good condition and working order; or (ii) replace the damaged or lost Items of Equipment with similar equipment of equal value in good condition and working order; or (iii) pay Purchaser in cash the higher of (A) the purchase price of the damaged or lost Items of Equipment, and (B) the full replacement value   of the damaged or lost Items of Equipment within thirty (30) days following Seller's knowledge of such Event of Loss.  Upon Seller's compliance with the foregoing, Purchaser shall pay or cause to be paid over to Seller the net proceeds of insurance, if any, with respect to such damage or loss.

(d)     Seller and Purchaser agree that the service fee payable to the Seller under the Maintenance Agreements shall be as detailed in each Purchase Supplement and summarized below:

> i.   Cache Creek Casino Resort: $1,268/month
>
> ii.  Isleta Casino and Resort: $778/month
>
> **iii.**  Doha Golf Club: $500/month
>
> **iv.**  Grand National: $1463/month (only six months per year)

## 6. Indemnification and Expenses.

(a)     Seller agrees to and does hereby indemnify and hold Purchaser and any successor, assignee or secured party of Purchaser and any directors, officers, partners, managers, members, employees, persons controlling or controlled by and any agents or attorneys of any of the foregoing, on an after-tax basis harmless from and against any and all expense, liability or loss whatsoever, including, without limitation, reasonable legal fees and expenses, which may be asserted against or incurred in any manner by or for the account of any of the foregoing persons, relating to or in any way arising out of this Agreement, the Purchase Supplements or the Lease Documents or the purchase, ownership, delivery, installation, possession, lease, use, operation, removal, return, sale, disposition or condition of the Equipment hereunder or in connection herewith (including, without limitation, expense, liability or loss relating to or in any way arising out of injury to persons or property, patent or invention rights or strict liability in tort).   Each party shall give the other party notice of any event or condition which requires indemnification by Seller hereunder, or any allegation of such event or condition, promptly upon obtaining knowledge thereof.  Seller shall pay Purchaser, upon demand, all amounts due under this <u>Section 6</u> .  All of the indemnities and agreements of Seller contained in this <u>Section 6</u> shall survive and continue in full force and effect notwithstanding termination of this Agreement or of the lease of any or all Items of Equipment hereunder.

(b)     Seller shall pay all fees, costs and expenses of Purchaser, including reasonable attorneys' fees and costs, relating to or arising from: (i) the exercise or enforcement of any of the rights of Purchaser under the Lease Documents; (ii) any failure by Seller or any third party to perform or observe any of the provisions of this Agreement or the Lease Documents; (iii) any litigation, contest, dispute, suit, proceeding or action (whether instituted by Purchaser, Seller or any other Person naming Purchaser as a party) in any way relating to this Agreement or any Lease Documents, Seller's affairs or the transactions contemplated herein, except to the extent such costs and expenses are for reimbursement of amounts paid to Purchaser in connection with any action resulting in a final, non-appealable judgment in Seller's favor against Purchaser by a court of competent jurisdiction; (iv) any consultation required by Purchaser, between Purchaser and its accountants, attorneys or agents reasonably relating to the provisions of this Agreement or any of the Lease Documents; (v) any attempt to enforce any rights of Purchaser against Seller or any other Person which may be obligated to Purchaser by virtue of this Agreement or any of the Lease Documents; and (vi) all other fees and expenses of Purchaser referred to or necessitated by the terms of this Agreement and the Lease Documents, and the performance hereof.

## 7.   [Intentionally omitted.]

## 8.   Events of Default; Remedies.

(a)     <u>Events of Default</u>.  The occurrence of any of the following shall constitute an event of default ("Event of Default"): (i) default in the performance of any of Seller's agreements in this Agreement (and not constituting an Event of Default under any of the other clauses of this paragraph) and continuance of such default for 30 days after the occurrence thereof; (iii) any representation or warranty made by Seller in this Agreement is untrue in any material respect, or any statement, report, schedule, notice, or other writing furnished by Seller to Purchaser in connection herewith is untrue in any material respect on the date as of which the facts set forth therein are stated or certified; (iii) Seller shall be in default in paying or performing any obligation, term, provision or condition (including the existence of an event of default thereunder) contained in any agreement with Purchaser or any affiliate of Purchaser after any applicable cure period; (iv) [intentionally omitted] (v) Seller winds up, dissolves, liquidates or otherwise terminates its legal existence, ceases to conduct business, or consolidates with or merges with or into any entity or Seller sells, leases or otherwise transfers all or substantially all of its assets to any entity, or incurs a substantial amount of indebtedness other than in the ordinary course of its business, or engages in a leveraged buy-out or any other form of corporate reorganization; and (vi) there is material adverse change in the business, operations, prospects, properties or financial condition of Seller, as determined by Purchaser in its reasonable sole discretion.   Within three Business Days after knowledge thereof shall have come to any officer of Seller, Seller shall provide to Purchaser written notice of the occurrence of any Event of Default or the existence of any condition which would, with notice or the passage of time or both, constitute an Event of Default.

(b)     <u>Effect on Seller's Obligation</u>.  Upon the occurrence of an Event of Default, Purchaser shall have no further obligation to Seller to purchase Equipment.

(c)    Remedies .  Upon the occurrence of an Event of Default as provided above, Purchaser may at its option proceed by appropriate court action or actions, either at law or in equity, to enforce performance by Purchaser of the applicable covenants of this Agreement and any applicable Purchase Supplement or to recover damages for the breach thereof.  Purchaser's rights and Seller's duties shall in no way be affected by Purchaser's inspection of, or failure to inspect, the Equipment or any unit thereof or any of the documents referred to in this Agreement or by Purchaser's failure to inform Seller of any failure to comply with any of Seller's obligations under this Agreement.  Seller hereby waives any right to assert that Purchaser cannot enforce this Agreement or that this Agreement is invalid because of any failure of Purchaser to qualify to do business in any jurisdiction.

## 9.  Rights Cumulative.

Unless otherwise expressly provided in this Agreement, all rights and remedies of Seller are concurrent and cumulative.  The exercise or partial exercise of any remedy shall not restrict Purchaser from further exercise of that remedy or any other remedy.  All rights, powers and remedies of the parties hereto shall survive the termination of this Agreement.

## 10.  Purchaser's Right to Perform.

If Seller fails to perform any obligations required by this Agreement and or the Lease Documents after any applicable cure period, Purchaser may make such payments or perform such obligations for the account of Seller without thereby waiving such Event of Default (but must provide written notice to Seller).  The amount of any such payment and Purchaser's costs and expenses, including, without limitation, reasonable legal fees and expenses in connection therewith and with such performance, shall thereupon be and become payable by Seller to Purchaser upon demand.

## 11.  Further Assurances.

Seller agrees, at its expense, promptly upon Purchaser's written request, to execute, acknowledge and deliver such instruments, and to take such other action, as may reasonably be necessary in the opinion of Purchaser to protect Purchaser's interests.

## 12.  Survival.

The representations and warranties of Seller in this Agreement shall survive the execution and delivery of this Agreement hereunder, and the indemnities and obligations contained in this Agreement shall survive the expiration or earlier termination of this Agreement.

## 13.  Assignment.

Seller will not, without Purchaser prior written consent, sell, assign, or transfer all or any part of its interests in or to this Agreement.

## 14. Notices.

All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery or refusal of delivery, if delivered in person, (ii) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Seller: | GPS Industries, Inc. |
| | 1358 Fruitville Road, Suite 210<br>Attention:  Chief Executive Officer<br>Facsimile No.:  (941) 364-8190 |
| If to Purchaser: | NewCo LLC |
| | 1348 Fruitville Road, Suite 210<br>Sarasota, FL 34236-4953<br>Attention: David Chessler |

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

## 15. Miscellaneous.

(a)    Entire Agreement; Amendment.   This Agreement, all Purchase Supplements executed and delivered by Seller and Purchaser contain the entire understanding of Seller and Purchaser.  References herein to this "Agreement" shall be deemed to include this Agreement together with all such Purchase Supplements except where the context otherwise requires; and the terms "hereunder," "herein" and similar terms shall refer to this Agreement and not to any particular Section or provision of this Agreement.  No amendment, modification, termination or waiver of any provision of this Agreement shall be effective unless in writing and signed by Seller and Purchaser.

(b)    Governing Law; Construction.   This Agreement has been delivered for acceptance by Seller in the State of Florida, and shall be governed by the internal laws of the State of Florida, without regard to the conflict of laws provisions thereof, and shall be binding upon and inure to the benefit of Seller and Purchaser and their respective successors and permitted assigns.  Seller and Purchaser have been represented by or have had the opportunity to be represented by counsel of their choosing in connection with the execution and delivery of this Agreement.  Seller and Purchaser intend that this Agreement be deemed to have been prepared by all of the parties and that no party shall be entitled to the benefit of any favorable interpretation or construction of any term or provision hereof under any rule or law.

(c)    Severability .  Whenever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law; but if any provision hereof or the application thereof to any party or circumstance is prohibited by or invalid under applicable law, then such provision shall be deemed severable from the remaining provisions of this Agreement and shall in no way affect the validity or enforceability of the other provisions of this Agreement.

(d)     Pronouns and Headings .  As used herein, all pronouns shall include the masculine, feminine, neuter, singular and plural thereof wherever the context and facts require such construction.  The headings, titles, and subtitles herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

(e)     Waiver.  No waiver by Seller of any breach or default shall constitute a waiver of any other breach or default by Purchaser or waiver of any of Seller's rights hereunder.  No purported waiver by Seller of any right, remedy, option, breach or default shall be binding unless in writing and signed by an officer of Seller.

(f)     Counterparts and Facsimile Signatures .  This Agreement may be executed in any number of identical counterparts, any or all of which may contain the signatures of less than all of the parties, and all of which shall be construed together as a single instrument.  Execution and delivery of this Agreement by exchange of facsimile or other electronic copies bearing the facsimile or other electronic signature of a party shall constitute a valid and binding execution and delivery of this Agreement by such party.  Any such facsimile copies shall constitute enforceable original documents.

(g)     Jury Trial; Venue; Jurisdiction .  PURCHASER WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (I) UNDER THIS AGREEMENT, THE PURCHASE SUPPLEMENTS OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT WHICH MAY BE DELIVERED IN THE FUTURE IN CONNECTION WITH THIS AGREEMENT OR (II) ARISING FROM THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR THE PURCHASE SUPPLEMENTS, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  PURCHASER IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT OR THE PURCHASE SUPPLEMENTS SHALL BE LITIGATED ONLY IN COURTS HAVING SITUS WITHIN SARASOTA COUNTY, FLORIDA.  PURCHASER HEREBY CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN SAID COUNTY AND STATE.  PURCHASER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE VENUE OF ANY SUCH ACTION OR PROCEEDING.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

IN WITNESS WHEREOF   Seller and Purchaser have executed this Agreement as of the date and year first above written.

SELLER:

**GPS INDUSTRIES, INC.**


By: _____
Its: _____

PURCHASER:

**GPS GOLF INVESTORS LLC**


By: _____
Its: _____

**SCHEDULE 1**

**DEFINED TERMS**

(a) " <u>Agreement</u> " shall mean this Agreement.

(b) " <u>Business Day</u> " shall mean any day that is not a Saturday or Sunday or a legal holiday in the State of Florida.

(c) " <u>Customer</u> " shall mean the golf course owner or manager identified as the lessee in the Lease Documents.

(d) " <u>Equipment</u> " shall mean the equipment or other personal property covered by a Purchase Supplement, together with all components, parts, additions, accessions, attachments and substitutions therefore and replacements thereof.

(e) " <u>Equipment Lease</u> " shall mean each equipment lease agreement between Purchaser and a Customer concerning an Item of Equipment.

(f) " <u>Event of Default</u> " has the meaning set forth in <u>Section 8</u> .

(g) " <u>Event of Loss</u> " shall have the meaning set forth in <u>Section 5</u> .

(h) " <u>Indemnified Party</u> " has the meaning set forth in <u>Section 6 (a)</u> .

(i) " <u>Item of Equipment</u> " shall mean any individual item of Equipment.

(j) " <u>Lease Documents</u> " shall mean the Equipment Lease, the Maintenance Agreement, and all other documents, schedules, exhibits, instruments and agreements attached hereto or thereto, or delivered in connection therewith, as the same are hereafter amended from time to time.

(k) " <u>Maintenance Agreement</u> " shall mean an agreement between Purchaser or its assignee and a third party providing for the service and maintenance of the Equipment listed on the corresponding Purchase Supplement.

(l) " <u>Person</u> " shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, institution, entity, party or government (whether national, federal, state, county, city, municipal or otherwise, including without limitation any instrumentality, division, agency, body or department thereof).

(m) " <u>Purchase Price</u> " shall have the meaning set forth in <u>Section 3</u> .

(n) " <u>Purchase Supplement</u> " shall mean each Bill of Sale and schedule for an Item of Equipment entered into between Seller and Purchaser pursuant to this Agreement, as amended from time to time.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its hand and seal as of the date first referenced above.

**COMPANY:**                                                      **EXECUTIVE:**

GPS Industries, Inc.                                          GPS Golf Investors, LLC


By:     /s/ J. Benjamin E. Porter                      By:     /s/ David L. Chessler
        J. Benjamin E. Porter                                   David L. Chessler
Its:    President                                      Its:    Manager

Exhibit 10.28

NEITHER THESE SECURITIES NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE OR FOREIGN COUNTRY IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR FOREIGN COUNTRY. THE SECURITIES REPRESENTED HEREBY MAY NOT BE OFFERED OR SOLD IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER APPLICABLE SECURITIES LAWS UNLESS OFFERED, SOLD OR TRANSFERRED UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THOSE LAWS.

Date: 23 April 2009

## GPS INDUSTRIES, INC.
## STOCK PURCHASE WARRANT

THIS CERTIFIES THAT, for value received, LEISURECORP LLC ("LEISURECORP") or its registered assigns, is entitled to purchase from GPS INDUSTRIES, INC. a Nevada corporation (the "Company"), at any time and from time to time during the Exercise Period (as defined in Section 2 hereof), Six Million Eight Hundred Eighty Three Thousand Three Hundred and Thirty Three (6,833,333) fully paid and nonassessable shares of the Company's common stock, (the "Common Stock"), at an exercise price per share (the "Exercise Price") of $.122 (the "Warrant"). The number of shares of Common Stock purchasable hereunder (the "Warrant Shares") and the Exercise Price are subject to adjustment as provided in Section 4 hereof.

This Warrant is subject to the following terms, provisions and conditions:

1.      (a) <u>Manner of Exercise; Issuance of Certificates</u> . Subject to the provisions hereof, including, without limitation, the limitations contained in Section 7 hereof, this Warrant may be exercised at any time during the Exercise Period by the holder hereof, in whole or in part, by delivery of a completed exercise agreement in the form attached hereto (the "Exercise Agreement"), to the Company by 5 p.m. Sarasota time on any Business Day at the Company's principal executive offices (or such other office or agency of the Company as it may designate by notice to the holder hereof) and upon payment to the Company as provided in Section 1(b) below of the applicable Exercise Price for the Warrant Shares specified in the Exercise Agreement. The Warrant Shares so purchased shall be deemed to be issued to the holder hereof or such holder's designee, as the record owner of such shares, as of the close of business on the date on which this Warrant shall have been surrendered and the completed Exercise Agreement shall have been delivered and payment shall have been made for such shares as set forth above or, if such day is not a Business Day, on the next succeeding Business Day. The Warrant Shares so purchased, representing the aggregate number of shares specified in the Exercise Agreement, shall be delivered to the holder hereof as promptly as practicable. If this Warrant shall have been exercised only in part, then, unless this Warrant has expired, the Company shall, at its expense, at the time of delivery of such certificates, deliver to the holder a new Warrant representing the number of shares with respect to which this Warrant shall not then have been exercised.

(b) <u>Payment of Exercise Price</u> . The holder shall pay the Exercise Price in immediately available funds.

2.      <u>Period of Exercise</u> . This Warrant may be exercised at any time or from time to time (an "Exercise Date") during the period (the "Exercise Period") beginning on (a) the date hereof and ending (b) at 5:00 p.m., Sarasota time, five years from the date hereof.

3.         <u>Certain Agreements of the Company</u>. The Company hereby covenants and agrees as follows:

        (a) <u>Shares to be Fully Paid</u>. All Warrant Shares will, upon issuance in accordance with the terms of this Warrant, be validly issued, fully paid and nonassessable and free from all taxes, liens, claims and encumbrances (except for restrictions existing under applicable securities laws).

        (b) <u>Reservation of Shares</u>. During the Exercise Period, the Company shall at all times have authorized, and reserved for the purpose of issuance upon exercise of this Warrant, a sufficient number of shares of Common Stock to provide for the exercise in full of this Warrant.

        (c) <u>Successors and Assigns</u>. This Warrant shall be binding upon any entity succeeding to the Company by merger, consolidation, or acquisition of all or substantially all of the Company's assets or any other similar transaction.

4.         <u>Antidilution Provisions</u>. During the Exercise Period, the Exercise Price and the number of Warrant Shares issuable upon the exercise of the Warrants, shall be subject to adjustment from time to time as provided in this Section 4.

        In the event that any adjustment of the Exercise Price as required herein results in a fraction of a cent, such Exercise Price shall be rounded up or down to the nearest cent; provided that, in no event shall the Exercise Price per share be reduced below $0.01.

        (a) <u>Subdivision or Combination of Common Stock</u>. If the Company, at any time during the Exercise Period, subdivides (by any stock split, stock dividend, recapitalization, reorganization, reclassification or otherwise) its shares of Common Stock into a greater number of shares, then, after the date of record for effecting such subdivision, the Exercise Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company, at any time during the Exercise Period, combines (by reverse stock split, recapitalization, reorganization, reclassification or otherwise) its shares of Common Stock into a smaller number of shares, then, after the date of record for effecting such combination, the Exercise Price in effect immediately prior to such combination will be proportionately increased.

        (b) <u>Adjustment in Number of Shares</u>. Upon each adjustment of the Exercise Price pursuant to the provisions of Sections 4(a) and (c), the number of shares of Common Stock issuable upon exercise of this Warrant shall be appropriately increased or decreased to equal the quotient obtained by dividing (i) the product of (A) the Exercise Price in effect immediately prior to such adjustment, multiplied by (B) the number of shares of Common Stock issuable upon exercise of this Warrant immediately prior to such adjustment, by (ii) the adjusted Exercise Price.

        (c) <u>Consolidation, Merger or Sale</u>. In case of any consolidation of the Company with, or merger of the Company into, any other entity, or in case of any sale or conveyance of all or substantially all of the assets of the Company or other similar transaction other than in connection with a plan of complete liquidation of the Company at any time during the Exercise Period, then as a condition of such consolidation, merger or sale or conveyance, adequate provision will be made whereby the holder of this Warrant will have the right to acquire and receive upon exercise of this Warrant in lieu of the shares of Common Stock immediately theretofore acquirable upon the exercise of this Warrant, such shares of stock, securities, cash or assets as may be issued or payable with respect to or in exchange for the number of shares of Common Stock immediately theretofore acquirable and receivable upon exercise of this Warrant had such consolidation, merger or sale or conveyance not taken place. In any such case, the Company will make appropriate provision to cause the provisions of this Section 4 thereafter to be applicable as nearly as may be in relation to any shares of stock or securities thereafter deliverable upon the exercise of this Warrant. The Company will not effect any consolidation, merger or sale or conveyance of all or substantially all of its assets or other similar transaction unless prior to the consummation thereof, the successor entity (if other than the Company) assumes by written instrument (a copy of which shall be delivered to the holder of this Warrant) the obligations under this Warrant and the obligations to deliver to the holder of this Warrant such shares of stock, securities or assets as, in accordance with the foregoing provisions, the holder may be entitled to acquire. The provisions of this Section 4(c) shall also apply to successive transactions covered by this section.

(d) <u>Distribution of Assets</u> . In case the Company shall declare or make any distribution of its cash or other assets (or rights to acquire its assets) to all holders of Common Stock as a partial liquidating dividend, stock repurchase, return of capital or otherwise (including any distribution to the Company's stockholders of shares (or rights to acquire shares) of capital stock of a subsidiary) (a "Distribution"), at any time during the Exercise Period, then, upon exercise of this Warrant for the purchase of any or all of the shares of Common Stock subject hereto, the holder of this Warrant shall be entitled to receive its pro-rata amount of such assets (or such rights) as would have been payable to the holder had such holder been the holder of such shares of Common Stock on the record date for the determination of stockholders entitled to such Distribution.

(e) <u>Subsequent Equity Sales at Less Than The Exercise Price</u> .

(i)   If the Company shall, at any time or from time to time, issue any shares of Common Stock (or be deemed to have issued shares of Common Stock as provided in Section 4(e)(ii)) other than Excluded Securities (as defined below), without consideration or for a consideration per share less than the Exercise Price in effect immediately prior to each such issuance then the Exercise Price shall forthwith (except as provided in this Section 4(e)(i)) be lowered to a price equal to the quotient obtained by dividing:

(1)   the total number of shares of Common Stock outstanding (including any shares of Common Stock deemed to have been issued pursuant to Section 4(e)(ii)(3)) (it being understood that the shares of Common Stock issuable upon exercise of this Warrant immediately prior to such issuance shall be deemed to be outstanding for all purposes of the computation required in this Section 4(e)(i)(1)), immediately prior to such issuance multiplied by the Exercise Price as in effect immediately prior to such issuance, plus

(2)   the consideration received by the Company upon such issuance, by

(3)   the total number of shares of Common Stock outstanding (including any shares of Common Stock deemed to have been issued pursuant to Section 4(e)(ii)) (it being understood that the shares of Common Stock issuable upon exercise of this Warrant immediately prior to such issuance shall be deemed to be outstanding for all purposes of the computation required in this Section 4(e)(i)(3)), immediately after the issuance of such Common Stock.

Following a reduction in the Exercise Price under this Section 4(e)(i), the total number of Warrant Shares issuable hereunder shall be proportionately increased such that the aggregate Exercise Price payable hereunder, after taking into account the decrease in the Exercise Price per Warrant Share, shall be equal to the aggregate Exercise Price for all Warrant Shares prior to such adjustment.

(ii)   For the purposes of any adjustment of the Exercise Price pursuant to Section 4(e)(i), the following provisions shall be applicable:

(1)            In the case of the issuance of Common Stock for cash, the consideration shall be deemed to be the amount of cash paid therefor before deducting therefrom any discounts, commissions or other expenses allowed, paid or incurred by the Company for any underwriting or otherwise in connection with the issuance and sale thereof.

(2)        In the case of the issuance of Common Stock for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair market value thereof as determined in good faith by the Board, irrespective of any accounting treatment.

(3)        In the case of the issuance of (x) options to purchase or rights to subscribe for Common Stock, (y) securities by their terms convertible into or exchangeable for Common Stock or (z) options to purchase or rights to subscribe for such convertible or exchangeable securities:

(i)        the aggregate maximum number of shares of Common Stock deliverable upon exercise of such options to purchase or rights to subscribe for Common Stock shall be deemed to have been issued at the time such options or rights were issued and for a consideration equal to the consideration (determined in the manner provided in Sections 4(e)(ii)(1), 4(e)(ii)(2) and 4(e)(ii)(3)), if any, received by the Company upon the issuance of such options or rights plus the minimum purchase price provided in such options or rights for the Common Stock covered thereby;

(ii)        the aggregate maximum number of shares of Common Stock deliverable upon conversion of or in exchange for any such convertible or exchangeable securities or upon the exercise of options to purchase or rights to subscribe for such convertible or exchangeable securities and subsequent conversion or exchange thereof shall be deemed to have been issued at the time such securities were issued or such options or rights were issued and for a consideration equal to the consideration received by the Company for any such securities and related options or rights (excluding any cash received on account of accrued interest or accrued dividends), plus the additional consideration, if any, to be received by the Company upon the conversion or exchange of such securities or the exercise of any related options or rights (the consideration in each case to be determined in the manner provided in Sections 4(e)(ii)(1), 4(e)(ii)(2) and 4(e)(ii)(3));

(iii)        on any change in the number of shares or exercise price of Common Stock deliverable upon exercise of any options or rights or conversions of or exchanges for such securities, other than a change resulting from the anti-dilution provisions thereof, the Exercise Price shall forthwith be readjusted to the Exercise Price as would have been obtained had the adjustment made upon the issuance of such options, rights or securities not converted prior to such change or options or rights related to such securities not converted prior to such change been made upon the basis of such change;

(iv)        on the expiration of any such options or rights, the termination of any such rights to convert or exchange or the expiration of any options or rights related to such convertible or exchangeable securities in each case having been issued by the Company, the Exercise Price shall forthwith be readjusted to the Exercise Price as would have been obtained had the adjustment made upon the issuance of such options, rights, securities or options or rights related to such securities been made on the basis that the only shares of Common Stock so issued were the shares of Common Stock, if any, actually issued or sold upon the exercise of such options or rights, upon the conversion or exchange of such securities, or upon the exercise of the options or rights related to such securities and subsequent conversion or exchange thereof; and

(v)        no further adjustment of the Exercise Price, as adjusted upon the issuance of such options or rights, rights to convert or exchange or options or rights related to such convertible or exchangeable securities.

(f)        Notice of Adjustment . Upon the occurrence of any event which requires any adjustment of the Exercise Price then, and in each such case, the Company shall give notice thereof to the holder of this Warrant, which notice shall state the Exercise Price resulting from such adjustment and the increase or decrease in the number of Warrant Shares issuable upon exercise of this Warrant, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Such calculation shall be certified by the chief financial officer of the Company.

(g)        <u>Minimum Adjustment of the Exercise Price</u> . No adjustment of the Exercise Price shall be made in an amount of less than 1% of the Exercise Price in effect at the time such adjustment is otherwise required to be made, but any such lesser adjustment shall be carried forward and shall be made at the time and together with the next subsequent adjustment which, together with any adjustments so carried forward, shall amount to not less than 1% of such Exercise Price.

(h)        <u>No Fractional Shares</u> . No fractional shares of Common Stock are to be issued upon the exercise of this Warrant, but the Company shall pay a cash adjustment in respect of any fractional share which would otherwise be issuable in an amount equal to the same fraction of the closing bid price of a share of Common Stock on the Principal Market on the date of such exercise.

(i)        <u>Other Notices</u> . In case at any time:

(i)        the Company shall declare any dividend upon the Common Stock payable in shares of stock of any class or make any other distribution (including dividends or distributions payable in cash out of retained earnings) to the holders of the Common Stock;

(ii)        the Company shall offer for subscription pro rata to the holders of the Common Stock any additional shares of stock of any class or other rights;

(iii)        there shall be any capital reorganization of the Company, or reclassification of the Common Stock, or consolidation or merger of the Company with or into, or sale of all or substantially all of its assets to, another corporation or entity; or

(iv)        there shall be a voluntary or involuntary dissolution, liquidation or winding up of the Company;

then, in each such case, the Company shall give to the holder of this Warrant (a) notice of the date or estimated date on which the books of the Company shall close or a record shall be taken for determining the holders of Common Stock entitled to receive any such dividend, distribution, or subscription rights or for determining the holders of Common Stock entitled to vote in respect of any such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation or winding-up and (b) in the case of any such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation or winding-up, notice of the date (or, if not then known, a reasonable estimate thereof by the Company) when the same shall take place. Such notice shall also specify the date on which the holders of Common Stock shall be entitled to receive such dividend, distribution, or subscription rights or to exchange their Common Stock for stock or other securities or property deliverable upon such reorganization, reclassification, consolidation, merger, sale, dissolution, liquidation, or winding-up, as the case may be. Such notice shall be given at least fifteen (15) days prior to the record date or the date on which the Company's books are closed in respect thereto. Failure to give any such notice or any defect therein shall not affect the validity of the proceedings referred to in clauses (i), (ii), (iii) and (iv) above. Notwithstanding the foregoing, the Company may publicly disclose the substance of any notice delivered hereunder prior to delivery of such notice to the holder of this Warrant.

(j) <u>Certain Events</u> . If, at any time during the Exercise Period, any event occurs of the type contemplated by the adjustment provisions of this Section 4 but not expressly provided for by such provisions, the Company will give notice of such event as provided in Section 4 hereof, and the Company's Board of Directors will make an appropriate adjustment in the Exercise Price and the number of shares of Common Stock acquirable upon exercise of this Warrant so that the rights of the holder shall be neither enhanced nor diminished by such event.

(k) Underline Certain Definitions .

        (i)                "Business Day" means any day, other than a Saturday or Sunday or a day on which banking institutions in the State of New York are authorized or obligated by law, regulation or executive order to close.

        (ii)               "Common Stock," for purposes of this Section 4, includes the Common Stock and any additional class of stock of the Company having no preference as to dividends or distributions on liquidation, provided that the shares purchasable pursuant to this Warrant shall include only Common Stock in respect of which this Warrant is exercisable, or shares resulting from any subdivision or combination of such Common Stock, or in the case of any reorganization, reclassification, consolidation, merger, or sale of the character referred to in Section 4(c) hereof, the stock or other securities or property provided for in such Section.

        (iii)              "Common Stock Equivalents" means any securities of the Company which would entitle the holder thereof to acquire at any time Common Stock, including, without limitation, any debt, preferred stock, rights, options, warrants or other instrument that is at any time convertible into or exercisable or exchangeable for, or otherwise entitles the holder thereof to receive, Common Stock.

        (iv)              "Excluded Securities" shall mean (i) any securities issued or issuable to employees, officers, directors of, or contractors, consultants or advisors to, the Company pursuant to stock purchase or stock option plans, stock bonuses or awards, contracts or other arrangements and any shares of Common Stock issuable upon exercise of any such securities, (ii) stock issued upon the conversion or exercise of any convertible securities, options, warrants or other rights to acquire capital stock of the Company issued on or before the date hereof, (iii) stock issued in connection with any stock split, stock dividend or recapitalization by the Company, (iv) securities issued pursuant to commercial credit arrangements, equipment financings or similar transactions, (v) stock issued upon exercise of this Warrant, and (vi) securities issued pursuant to strategic transactions with an operating company in a business synergistic with the business of the Company and in which the Company receives benefits in addition to the investment of funds or pursuant to acquisitions or equipment leases, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities.

        (i)                "Principal Market" means the Over-the-Counter Bulletin Board or, if the Common Stock is not traded on the Over-the-Counter Bulletin Board, then the principal securities exchange or trading market for the Common Stock.

    5.        Issue Tax . The issuance of certificates for Warrant Shares upon the exercise of this Warrant shall be made without charge to the holder of this Warrant or such shares for any issuance tax or other costs in respect thereof, provided that the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any certificate in a name other than the holder of this Warrant.

    6.        No Rights or Liabilities as a Stockholder . This Warrant shall not entitle the holder hereof to any voting rights or other rights as a stockholder of the Company. No provision of this Warrant, in the absence of affirmative action by the holder hereof to purchase Warrant Shares, and no mere enumeration herein of the rights or privileges of the holder hereof, shall give rise to any liability of such holder for the Exercise Price or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

7.        Transfer, Exchange, Redemption and Replacement of Warrant .

(a) Restriction on Transfer . This Warrant and the rights granted to the holder hereof are transferable in whole or in part, at any one time, upon surrender of this Warrant, together with a properly executed assignment in the form attached hereto, at the office or agency of the Company referred to in Section 7(e). Until due presentment for registration of transfer on the books of the Company, the Company may treat the registered holder hereof as the owner and holder hereof for all purposes, and the Company shall not be affected by any notice to the contrary.

(b) Warrant Exchangeable for Different Denominations . This Warrant is exchangeable, upon the surrender hereof by the holder hereof at the office or agency of the Company referred to in Section 7(e) below, for new Warrants of like tenor of different denominations representing in the aggregate the right to purchase the number of shares of Common Stock which may be purchased hereunder, each of such new Warrant to represent the right to purchase such number of shares as shall be designated by the holder hereof at the time of such surrender.

(c) Replacement of Warrant . Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction, or mutilation of this Warrant and, in the case of any such loss, theft, or destruction, upon delivery of an indemnity agreement reasonably satisfactory in form and amount to the Company, or, in the case of any such mutilation, upon surrender and cancellation of this Warrant, the Company, at its expense, will execute and deliver, in lieu thereof, a new Warrant of like tenor.

(d) Cancellation; Payment of Expenses . Upon the surrender of this Warrant in connection with any transfer, exchange, or replacement as provided in this Section 7, this Warrant shall be promptly canceled by the Company. The Company shall pay all taxes (other than securities transfer taxes) and all other expenses (other than legal expenses, if any, incurred by the holder or transferees) and charges payable in connection with the preparation, execution, and delivery of Warrants pursuant to this Section 7.

(e) Warrant Register . The Company shall maintain, at its principal executive offices (or such other office or agency of the Company as it may designate by notice to the holder hereof), a register for this Warrant, in which the Company shall record the name and address of the person in whose name this Warrant has been issued, as well as the name and address of each transferee and each prior owner of this Warrant.

(f) Exercise or Transfer Without Registration . If, at the time of the surrender of this Warrant in connection with any exercise, transfer, or exchange of this Warrant, this Warrant (or, in the case of any exercise, the Warrant Shares issuable hereunder), shall not be registered under the Securities Act and under applicable state securities or blue sky laws, the Company may require, as a condition of allowing such exercise, transfer, or exchange, (i) that the holder or transferee of this Warrant, as the case may be, furnish to the Company a written opinion of counsel (which opinion shall be reasonably acceptable to the Company and shall be in form, substance and scope customary for opinions of counsel in comparable transactions) to the effect that such exercise, transfer, or exchange may be made without registration under the Securities Act and under applicable state securities or blue sky laws, (ii) that the holder or transferee execute and deliver to the Company an investment letter in form and substance reasonably acceptable to the Company and (iii) that the transferee be an "accredited investor" as defined in Rule 501(a) promulgated under the Securities Act; provided, that no such opinion, letter, or status as an "accredited investor" shall be required in connection with a transfer pursuant to Rule 144 under the Securities Act.

8.          Notices . Any notices required or permitted to be given under the terms of this Warrant shall be delivered personally or by courier or by confirmed telecopy, and shall be effective five (5) days after being placed in the mail, if mailed, or upon receipt or refusal of receipt, if delivered personally or by courier, or by confirmed telecopy, in each case addressed to a party. The addresses for such communications shall be:

> If to Leisurecorp LLC.
> C/o Istithmar PJSC
> Emirate Tower - Level 4
> Dubai, United Arab Emirates
>
> Attn: David Spencer
> Chief Executive Officer
> Telephone: +9714-3687630
> Telecopier: +9714-3687654

If to any other holder, at such address as such holder shall have provided in writing to the Company, or at such other address as such holder furnishes by notice given in accordance with this Section.

10.          Governing Law; Venue . All questions concerning the construction, validity, enforcement and interpretation of this Warrant shall be governed by and construed and enforced in accordance with the laws of the State of New York. Each party agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Warrant shall be commenced exclusively in the state and federal courts sitting in the City of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, borough of Manhattan for the adjudication of any dispute hereunder, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Warrant and agrees that such service shall constitute good and sufficient service of process and notice thereof.

11.          Miscellaneous .

(a) This Warrant and any provision hereof may only be amended by an instrument in writing signed by the Company and the holder hereof.

(b) The descriptive headings of the several Sections of this Warrant are inserted for purposes of reference only, and shall not affect the meaning or construction of any of the provisions hereof.

(c) In case any one or more of the provisions of this Warrant shall be invalid or unenforceable in any respect, the validity and enforceability of the remaining terms and provisions of this Warrant shall not in any way be affected or impaired thereby and the parties will attempt in good faith to agree upon a valid and enforceable provision which shall be a commercially reasonable substitute therefore, and upon so agreeing, shall incorporate such substitute provision in this Warrant.

(d) Subject to the restrictions on transfer set forth herein, this Warrant may be assigned by the holder. This Warrant may not be assigned by the Company. This Warrant shall be binding on and inure to the benefit of the parties hereto and their respective successors and assigns. Subject to the preceding sentence, nothing in this Warrant shall be construed to give to any Person other than the Company and the holder any legal or equitable right, remedy or cause of action under this Warrant.

(e) The Company will not, by amendment of its governing documents or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the holder hereof against impairment. Without limiting the generality of the foregoing, the Company (i) will not increase the par value of any Warrant Shares above the amount payable therefore on such exercise, (ii) will take all such action as may be reasonably necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable Warrant Shares on the exercise of this Warrant, and (iii) will not close its stockholder books or records in any manner which interferes with the timely exercise of this Warrant.

(f) In the event that the Company fails to observe or perform any covenant or agreement to be observed or performed under this Warrant, the holder of this Warrant may proceed to protect and enforce its rights by suit in equity or action at law, whether for specific performance of any term contained in this Warrant or for an injunction against the breach of any such term or in aid of the exercise of any power granted in this Warrant or to enforce any other legal or equitable right, or to take any one or more of such actions, without being required to post a bond. None of the rights, powers or remedies conferred under this Warrant shall be mutually exclusive, and each such right, power or remedy shall be cumulative and in addition to any other right, power or remedy, whether conferred by this Warrant or now or hereafter available at law, in equity, by statute or otherwise.

IN WITNESS WHEREOF, the Company has caused this Warrant to be signed by its duly authorized officer.

GPS INDUSTRIES, INC.

By: /s/ J. Benjamin E Porter

Name: J. Benjamin E. Porter
Title: President

# FORM OF EXERCISE AGREEMENT

## (To be executed by the holder in order to Exercise the Warrant)

To:      GPS Industries, Inc.
        1358 Fruitville Road, Suite 210
        Sarasota, FL 34236
        Telecopier:              (941) 364-8190
        Attn:                  Chief Executive Officer

The undersigned hereby irrevocably exercises the right to purchase _____ shares of the Common Stock of GPS INDUSTRIES, INC., a corporation organized under the laws of the State of Nevada (the "Company"), and tenders herewith payment of the Exercise Price in full, in the amount of $_____, in cash, by certified bank check or by wire transfer for the account of the Company.

The undersigned agrees not to offer, sell, transfer or otherwise dispose of any Common Stock obtained on exercise of the Warrant, except under circumstances that will not result in a violation of the Securities Act of 1933, as amended, or any state securities laws.

☐      The undersigned requests that the Company cause its transfer agent to electronically transmit the Common Stock issuable pursuant to this Exercise Agreement to the account of the undersigned or its nominee (which is _____) with DTC through its Deposit Withdrawal Agent Commission System (" **DTC Transfer** ").

☐      In lieu of receiving the shares of Common Stock issuable pursuant to this Exercise Agreement by way of DTC Transfer, the undersigned hereby requests that the Company cause its transfer agent to issue and deliver to the undersigned physical certificates representing such shares of Common Stock.

The undersigned requests that a Warrant representing any unexercised portion hereof be issued, pursuant to the Warrant, in the name of the Holder and delivered to the undersigned at the address set forth below:

Dated:_____

                         _____
                         Signature of Holder

                         _____
                         Name of Holder (Print)
                         Address:
                         _____
                         _____
                         _____

# FORM OF ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sells, assigns, and transfers all the rights of the undersigned under the attached Warrant, with respect to the number of shares of Common Stock covered thereby issuable pursuant to the attached Warrant set forth herein below, to:

Name of Assignee                              Address                                          No of Shares

and hereby irrevocably constitutes and appoints _____ as agent and attorney-in-fact to transfer said Warrant on the books of the within-named corporation, with full power of substitution in the premises.

Dated: _____, _____
In the presence of
_____

Name:

Signature:
Title of Signing Officer or Agent (if any):

Address: _____

Note:   The above signature should correspond exactly with the name on the face of the within Warrant

Exhibit 31.1

# CERTIFICATIONS

I, Mr. David Chessler, certify that:

1. I have reviewed this quarterly report on Form on 10-Q of GPS Industries, Inc.

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officer and I, are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting, and;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2009

/s/ David Chessler
David Chessler
Chief Executive Officer

Exhibit 31.2

## CERTIFICATIONS

I, Mr. Russell R. Lee III, certify that:

1. I have reviewed this quarterly report on Form on 10-Q of GPS Industries, Inc.

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officer and I, are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting, and;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 15, 2009

/s/ Russell R. Lee III
_____
Russell R. Lee III
Chief Financial Officer

Exhibit 32

CERTIFICATION PURSUANT TO
18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the quarterly report of GPS Industries, Inc. on Form 10-Q for the quarter ending March 31, 2009 as filed with the Securities and Exchange Commission on the date hereof (Report), each of the undersigned officers of the Company, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to 906 of the Sarbanes-Oxley Act of 2002, that:

(1)    The Report fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/  David Chessler

David Chessler

Chief Executive Officer

May 15, 2009

/s/  Russell R. Lee III

Russell R. Lee III

Chief Financial Officer

May 15, 2009

# Exhibit D

July-Nov 2009 Cash

Updated: 8/5/2009 21:56

| Item | | 31-Jul | 15-Aug | 31-Aug | 15-Sep | 30-Sep | 15-Oct | 31-Oct | 15-Nov | 30-Nov |
|---|---|---|---|---|---|---|---|---|---|---|
| **Projected cash:** | | | | | | | | | | |
| Hawks Landing | a | | | | 20000 | 3500 | | 128000 | 3500 | 3500 |
| Bonnet Creek | b | | | | | | | | | |
| Abu Dhabi | c | | | | | 320000 | | | | |
| Saadiyat Beach | d | | | | | 0 | | 280000 | | |
| Al Canada( UK Sub) | e | | | 60000 | | | | | | |
| Grand National | | 70000 | | | 70000 | | | | | |
| Bear Mountain | | | | | | | | | | |
| GPSI Asia | | 0 | 15500 | | | | | | | |
| GPSI UK | | | | | | | | | | |
| V2 Sales | | | | | | | | | 96000 | |
| Brian | | 0 est | 0 est | 0 est | 0 est | 0 est | 0 | 0 | | |
| DC Invoices | | 6000 | | | | | | | | |
| Shadow Mtn | 280 | 0 | 0 | | | | | | | |
| Mirimchi | 277 | 277000 Payoff | | | | | | | | |
| Other--service | | 10000 est | 53784 est | 53784 est | 53784 est | 53784 est | 53784 est | 53784 est | 53784 est | 53784 |
| Collection Contingency | | 0 | (13784) | (13784) | (13784) | (13784) | (13784) | (13784) | (13784) | (13784) |
| Prolink--other | | | | | | | | | | |
| | | 363000 | 55500 | 100000 | 130000 | 360000 | 43500 | 448000 | 139500 | 43500 |
| **Cash needed:** | | | | | | | | | | |
| US Payroll | | 0 | 294000 | 147000 | 147000 | 147000 | 147000 | 147000 | 147000 | 147000 |
| Can Payroll | | 0 | 40000 | 10000 | 10000 | 10000 | 10000 | 10000 | 10000 | 10000 |
| UHC | | 0 | 31067 | | 31067 | | 31067 | | | |
| Contractors: | | | | | | | | | | |
| Sales | | 14084 | 6042 | 6042 | 6042 | 6042 | 6042 | 6042 | 6042 | 6042 |
| Operations | | 7000 | 12000 | 12000 | 12000 | 12000 | 7000 | 7000 | 7000 | 7000 |
| Appraiser | | | 5000 | | | | | | | |
| McIntyre | | 100000 | | 0 | | | | | | |
| AMEX(contingency) | | 0 | | | | 50000 | | | | |
| Product Costs(in general): | | | | | | | | | | |
| Hawks Landing | | | 20000 | | | | | | | |
| Bonnet Creek | | | 0 | 0 | | 64000 | | 64000 | | |
| Abu Dhabi | | 75000 | | | | | | | | |
| Saadiyat Beach | | | 0 | 0 | 67500 | | 67500 | | | |
| Al Canada | | | 20000 | | 20000 | | | | | |
| Grand National | | | | 20000 | | | | | | |
| 2 V2 systems | | | | | | | | | 96000 | 20000 |
| EMS | | 0 | 30000 | 20000 | | | | | | |
| AMS | | 0 | | | | | | | | |
| AGN (arms) | | 0 | 17000 | | | | | | | |
| Itron (pams) | | 0 | | | | | | | | |
| Shadow (misc parts) | | 0 | | 0 | | | | | | |
| **Mirimchi (misc parts)** | | 1000 | | | | | | | | |
| **UPS** | | 0 | | | | | | | | |
| New building | | | | | | | | | | |
| Anchor Locksmith | | 450 | | | | | | | | |
| Electrician | | 432 | | | | | | | | |
| Sunshine Cleaning | | 1900 | | | | | | | | |
| Effectuer | | 6650 | | | | | | | | |
| Carlos painting | | 350 | | | | | | | | |
| Miscellaneous | | | | | | | | | | |
| Due diligence | | 0 | | | 20000 | | | | | |
| Reorg | | | 10000 | 10000 | 10000 | 10000 | 10000 | 10000 | 10000 | 10000 |
| Commisions: | | | | | | | | | | |
| Ballenger | | 15000 | | | | | | | | |
| Bate | | 6200 | 0 | 0 | | 10000 | | | | |
| Miller | | 0 | | | | | | | | |
| Bryant | | 0 | | | | | | | | |
| Employee Expenses | | 10000 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 | 30000 |
| V2 Project: | | | | 0 | | | | | | |
| Exahortz | | 10000 | | 0 | | | 10000 | | | |
| PDT | | 18000 | | | | 18000 | | 18000 | | |
| Prototype | | | 10000 | 10000 | 25000 | | | | | |
| Testing/certification | | | | | | 10000 | 5000 | | 10000 | |
| Production tooling | | | | | | 10000 | 10000 | | 10000 | |
| Beta units | | | | | | 25000 | 25000 | | | |
| AP List: | | | | | | | | | | |
| Vision Perfect | | 3000 | | | | | | | | |
| Catlin | | 5022 | | | | | | | | |
| Ryan Screen Printing | | 3975 | | | | | | | | |
| Rent | | 0 | 0 | 2500 | 0 | 17000 | 0 | 17000 | 0 | 17000 |
| Other AP | | 35000 | 35000 | 37500 | 35000 | 52000 | 35000 | 52000 | 35000 | 52000 |
| | | 46997 | 35000 | 37500 | 35000 | 52000 | 35000 | 52000 | 35000 | 52000 |
| | | 238063 | 605109 | 312542 | 596609 | 351042 | 393609 | 369042 | 412109 | 262042 |
| | | 124937 | (549609) | (212542) | (466609) | 8958 | (350109) | 78958 | (272609) | (218542) |
| **Cash on hand** | | (51111) | 73626 | (475983) | (688525) | (1155134) | (1146176) | (1496285) | (1417327) | (1689936) |
| | | 73626 | (475983) | (688525) | (1155134) | (1146176) | (1496285) | (1417327) | (1689936) | (1908478) |